JOINER, Judge.
William Bruce Marshall, an inmate on death row, appeals the Jefferson Circuit Court’s summary dismissal, in ■ part," and denial, in part, of his Rule 32, Ala. R.Crim. P., petition for postconviction relief. We affirm.

Facts and Procedural History

In 2005, Marshall was convicted of two counts of capital murder for the killing of his stepdaughter, Alicia Nicole Bentley— one count of murder made capital because it occurred during a burglary, see § 13A-5-40(a)(4), Ala.Code 1975, and one count of murder made capital because it occurred while Marshall, who was over the age of 19 years, sexually abused or attempted to sexually abuse Alicia, who was between the ages of 12 and 16 years, see § 13A-5-40(a)(8), Ala.Code 1975.[1] This Court, on direct appeal, summarized the facts underlying Marshall’s convictions as follows:
“Marshall did not dény that he killed 15-year-old Alicia. Indeed, while in police custody he confessed to the killing and eventually led police to Alicia’s body. His attorneys, however, presented a defense in which Marshall attempted to call into question the allegation that he had had any kind of sexual contact with Alicia,.
“The evidence adduced at trial tended to show the following facts. On December 28, 2004, Tonya Bentley called the Vestavia Hills Police Department to re- , port that her daughter, Alicia, was missing from their apartment. Tonya Bentley and Marshall had separated in early December 2004. Tonya, Alicia, and Tonya’s newborn son had moved from the apartment they had shared with Marshall into an apartment -in a different complex. Tonya still had personal belongings at Marshall’s, and her name was on the lease for that apartment.
“Tonya told police that she believed .th^t.Marshall may have known of Alicia’s whereabouts. She based her belief on the fact that she had. discovered a videocassette recorder, or VCR, that . Alicia had left at the old apartment in a chair in the new apartment when she got home. Tonya was positive that the VCR had not been in the apartment when. she. left for work that morning. When Tonya called Marshall to ask ■ whether he. had seen Alicia that day, however, he denied having come to the apartment. -
“Further, Tonya and Marshall had spoken earlier that day about the possibility of Marshall bringing Tonya the washer and dryer. Tonya said that Marshall asked her when she would be home so that he could bring the appliances over. .He also said he was going to rent an appliance dolly to make the move easier.
“After speaking with Tonya, police alerted other law-enforcement agencies to be on the lookout for Alicia. Police went to Marshall’s apartment, where they could hear the dryer running inside, but no one answered the door when they knocked. Marshall’s truck was parked outside the apartment, and "neighbors said that they had seen him go into the apartment but had not seen him come back .out. Police attempted to call' Marshall and have neighbors call Marshall, but no one answered the telephone inside the apartment.
*578 “Tonya attempted to open the front door with her key, but the lock had been changed. The manager of the apartment complex also attempted to open the lock with the master key, but that key did not work, either. After receiving permission from Tonya to enter the apartment, police simultaneously broke down the front and back doors to the apartment and found Marshall inside.
“Detective Mike O’Connor of the Ves-tavia Hills Police Department testified that, as police searched the apartment, Marshall was handcuffed both for his safety and for the safety of the police. Alicia was not found in Marshall’s apartment, and O’Connor asked Marshall to come to city hall with him. Marshall agreed and the police took him to city hall. O’Connor said that he told Marshall that he was not under arrest at that time and removed the handcuffs from him before he got into the car.
“O’Connor said that even though Marshall had not been arrested at that point, he was advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), while they were still at the apartment. O’Connor said that he advised Marshall of his rights again once they reached his office. Marshall signed a waiver-of-rights form and initially denied knowing anything about Alicia’s whereabouts. O’Connor said that he explained to Marshall that he was not under arrest and that he was free to leave, but because the doors were broken at the apartment, Marshall chose to stay at city hall. O’Connor testified that the only place he had for Marshall to stay was in a cell, but that Marshall only had to ask to leave and he would have been free to go that night.
“Police continued to investigate Alicia’s disappearance throughout the night of December 28 and into the morning hours of December 29, 2004. During their investigation, they discovered clothes, shoes, a purse, and a comforter identified as Alicia’s in a dumpster at an apartment complex next to the apartment complex where Marshall lived. Their investigation also showed that Marshall left work and was unaccounted for during several hours the afternoon of December 28.
“On the morning of December 29, after finding the comforter, clothes, and purse, police got an arrest warrant for Marshall based on kidnapping. In addition, law-enforcement officials discovered Alicia’s driver’s license and her library card in a dumpster at Marshall’s job site. Once police obtained the kidnapping warrant, O’Connor said, Marshall was arrested, and he was no longer free to leave. Marshall was not questioned again until about 1:00 p.m. on the afternoon of December 29.
“Agents from the Federal Bureau of Investigation (‘FBI’) assisted the Vesta-via Hills Police Department in questioning Marshall. When FBI agents interrogated Marshall, they also advised him of his Miranda rights. Marshall signed a form indicating that he understood his rights. While the agents were questioning Marshall the evening of December 29, one day after Alicia had been reported missing, Marshall admitted that he ‘had done a terrible thing.’ (R. 444.) Agent Scott Keeler of the FBI said that Marshall told him he ‘had gotten into a verbal argument with Alicia that had become violent and he had struck her in the head with his fist.’ (R. 444.) He said he was not sure whether she was okay and that he had taken her out in the country and dropped her off.
“Marshall rode with law-enforcement officials to an area outside Columbiana. After searching off various side roads, Marshall was finally able to lead authorities to Alicia’s body. She was nude, except for a pair of white socks.
*579 “Dr. Art Shores, a forensic pathologist with the Alabama Department of Forensic Sciences,--testified that he performed an autopsy on the body, which revealed that Alicia had been strangled to death. - Dr. Shores also testified that Alicia had a small vaginal mucosal tear. The tear probably occurred within 24 to 48 hours of Dr. Shores’s examination of the body, which was conducted on December 30, 2004.”
Marshall v. State, 992 So.2d 762, 765-67 (Ala.Crim.App.2007). The jury, by a vote of 11 to 1, recommended that Marshall be sentenced to death. The trial court followed the jury’s recommendation and sentenced Marshall to death, finding
“the existence of the following statutory aggravating circumstances: (1) that the capital offense was committed while ■Marshall was under sentence of imprisonment; (2) that Marshall had previously been convicted of-a felony involving the use or threat of violence- to the person; and (3) that Marshall was engaged in the commission of a burglary at the time the capital offense was committed.
“The trial court found no statutory mitigating circumstances existed. It further found that there were no non-statutory mitigating circumstances.”
Marshall, 992 So.2d at 779.
This Court, on direct appeal, affirmed Marshall’s convictions and sentence in an opinion issued on August 31, 2007. See Marshall, supra. The Alabama Supreme Coürt denied certiorari review without opinion on April 25, 2008, Ex parte Marshall (No. 1070461), and this Court, on that same date, issued a certificate of judgment making Marshall’s direct appeal final.
On April 23, 2009, Marshall filed the instant Rule 32, Ala. R.Crim. P., petition for postconviction relief (C. 71-138), and he filed his first amended Rule 32 petition on July 10,2009. (C. 144-216.) The State filed an answer and motion to dismiss Marshall’s. Rule 32. petition on July 18, 2009 (C. 218-78), and an answer and motion to dismiss Marshall’s'first amended Rule 32 petition on July 31, 2009. (C. 337-98.) On September 8, 2009, the circuit court conducted a hearing on the State’s motions to dismiss Marshall’s Rule 32 petition and his first amended Rule 32 petition. The circuit court on September 11, 2009, entered a written order summarily dismissing Marshall’s Rule 32 petition in part but also allowing Marshall to amend some of the -claims raised- in his Rule 32 petition. (C. 495-501.)
On October 2, 2009, Marshall filed a motion to reconsider the circuit court’s order summarily dismissing his Rule 32 petition in part, a motion amending those claims that the circuit court had allowed him to amend (C. 502-11), a “motion to reconsider the refusal to allow [Marshall] to amend his petition” (C. 513-17), and a second amended Rule 32 petition. (C. 518-601.) The State filed a response to Marshall’s motion to reconsider on October 13, 2009 (C. 602-07), and, thereafter, on November 3, 2009⅜ the State filed an “answer and motion for partial dismissal of Marshall’s October 2, 2009, amendment to his first amended Rule 32 petition.” (C. 608-22.) On December 2, 2009, the circuit court issued an order denying, in part, and granting, in part, the State’s motion for partial dismissal. (C. 29-30.) On February 16, 2010, the circuit court conducted an evidentiary hearing, which, after the testimony of witnesses was taken, was continued until April 1, 2010,' so that one of Marshall’s trial counsel — Linda Hall, who no longer resided in Alabama — could testify.[2] The circuit court, in a written order, *580 denied Marshall’s petition on December 21, 2010. (C. '979-1039.) Marshall appealed to this Court. See Rule 32.10, Ala. R.Crim. P. 1 • -

Standard of Review

“[Marshall] has the burden of pleading and proving his claims. As Rule 32.3, Ala. R.Crim. P., provides: ,-
“ ‘The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the,burr den of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.’ . : .
“ ‘The standard of review this Court uses in evaluating the rulings made by the trial court [in a postconviction proceeding] is • whether the trial court abused its. discretion.’ Hunt v. State, 940 So.2d 1041, 1049 (Ala.Crim.App.2005). However, ‘when the facts are undisputed and an appellate court is presented with pure questions of law, [our] review in a Rule 32 proceeding is ■dé novo.’ Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). [W]e may affirm a circuit court’s ruling on a postconviction petition if it is correct for any reason.’ Smith v. State, [122] So.3d [224], [227] (Ala.Crim.App.2011).
“As stated above, [some] of the claims raised by [Marshall] were summarily dismissed based on defects in the pleadings and the application of the procedur'al 'bars in Rule 32.2, Ala. R.Crim. P. 'Wien discussing the pleading requirements for póstconvietion petitions, we have stated:
“‘The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will hot satisfy the requirements of Rule - 32.3 and Rule 32.6(b). The full factual basis for the claim must be included >in the petition itself.' If, assuming-every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of. pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So.2d 724 (Ala.Crim.App.2003).’
“Hyde v. State, 950 So.2d 344, 356 (Ala.Crim.App.2006).
“‘“Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.” Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not •the pleading of a conclusion “which, if true, entitle[s] the petitioner to relief.” Lancaster & State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of-facts in pleading which, if true, entitle a petitioner to relief. After facts are.pleaded, which, if true, entitle the petitioner to relief, the petitioner. is then, entitled to an opportunity, as provided in Rule: 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts.’
“Boyd v. State, 913 So.2d 1113, 1125 (Ala.Crim.App.2003). ‘[T]he procedural bars of Rule 32[.2, Ala. R.Crim. P.,] apply with equal force to all cases, including those, in which the death penalty has been imposed.’ Burgess v. State, 962 So.2d 272, 277 (Ala.Crim.App.2005).
“Some, of [Marshall’s] claims were also dismissed based on his failure to comply *581 with Rule 32.7(d), Ala. R.Crim. P. In discussing the application of this rule we have stated:
“ ‘[A] circuit court may, in some circumstances, summarily dismiss a post-conviction petition based on the merits of the claims raised therein. Rule 32.7(d), Ala. R.Crim. P., provides:
“ ‘ “If the court determines that the, petition is, not .sufficiently. specific, or is precluded, or ■ fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner.to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.”
“““Where a simple reading of the petition for post-conviction relief shows that, assuming, every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition.’ ” Bishop v. State, 608 So.2d 345, 347-48 (Ala.1992) (emphasis added) (quoting Bishop v. State, 592 So.2d 664, 667 (Ala.Crim.App.1991) (Bowen, J., dissenting)). See also Hodges v. State, 147 So.3d 916, 934 (Ala.Crim.App.2007). (a postconviction claim is “due to be summarily dismissed [when] it is meritless on its face’% rev’d on other grounds, Ex parte Hodges, 147 So.3d 973 (Ala.2011) ].’
“Bryant v. State, 181 So.3d 1087, 1102 (Ala.Crim.App.2011).”
Washington v. State, 95 So.3d 26, 38-39 (Ala.Crim.App.2012).
Marshall’s remaining claims were denied by the circuit court after Marshall was afforded the opportunity to prove those claims at an evidentiary hearing. See Rule 32.9(a), Ala. R.Crim. P.
When the circuit court conducts an evidentiary hearing, “[t]he burden of proof in a Rule 32 proceeding rests solely with the petitioner, not the State.” Davis v. State, 9 So.3d 514, 519 (Ala.Crim.App.2006), rev’d on other grounds, 9 So.3d 537 (Ala.2007). “[I]n a Rule 32, Ala. R.Crim. P., proceeding, the burden of proof is upon the petitioner seeking post-conviction relief to establish his grounds for relief by a preponderance of the evidence.” Wilson v. State, 644 So.2d 1326, 1328 (Ala.Crim.App.1994). Rule 32.3, Ala. R.Crim. P., specifically provides that “[t]he petitioner shall have the burden of ... proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.” “[W]hen the facts are undisputed and an appellate court is presented with pure .questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). “However, where there are disputed facts in a posteonviction proceeding and the circuit court resolves those disputed facts, ‘[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.’ ” Boyd v. State, 913 So.2d 1113, 1122 (Ala.Crim.App.2003) (quoting Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992)).
Finally, “[although on direct appeal we reviewed [Marshall’s] capital-murder conviction for plain error, the plain-error standard of review does not apply when an appellate court is reviewing the denial of a postconviction petition attacking a death, sentence.” James v. State, 61 So.3d 357, 362 (Ala.Crim.App.2010) (citing Ex parte Dobyne, 805 So.2d 763 (Ala.2001)). With these principles in mind, we *582 review the claims raised by Marshall on appeal.

Discussion

I.
 Marshall contends..that his trial counsel were ineffective during both the guilt phase and penalty phase of his trial.[3]
“To prevail on a claim of ineffective assistance of counsel, the petitioner must show (1). that counsel’s performance was deficient and (2) that the petitioner was prejudiced by the deficient performance. See Strickland v. Washington, 466 U.S. 668 (1984).
, “ ‘Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for'a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation,- a court must indulge a strong presumption that ■counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.’
“Strickland, 466 U.S. at 689.
“ ‘[T]he purpose of ineffectiveness- review is not to grade counsel’s performance. See Strickland [v. Washington], (466 U.S. 668,] 104 S.Ct. [2052] at. 2065 [ (1984) ]; see. also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (“We are not interested in grading lawyers’ performances; we‘are interested in whether the adversarial process at trial, in fact, worked adequately.”). We recognize that “[r]epresentation is an-art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.” Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. -To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or “what is prudent or appropriate, but only what is constitutionally compelled.” Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).’
“Chandler v. United States, 218 F.3d 1305, 1313-14 (11th Cir.2000) (footnotes omitted).
“An appellant is not’entitled to ‘perfect representation.’ Denton v. State, 945 S.W.2d 793, 796 (Tenn.Crim.App.1996). ‘[I]n considering claims of ineffective assistance- of counsel, “we address not what is prudent or appropriate, but only what is constitutionally compelled.” ’ Burger v. Kemp, 483 U.S. 776, 794 (1987).”
Yeomans v. State, [Ms.. CR-10-0095, March 29, 2013] — So.3d -, - (Ala.Crim.App.2013). Additionally, “ ‘[w]hen *583 courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.’ ” Ray v. State, 80 So.3d 965, 977 n. 2 (Ala.Crim.App.2011) (quoting Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir.2000)).
We also recognize that'when reviewing claims- of ineffective assistance of counsel “the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.” Strickland, v. Washington, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), This Court, however, has held, that when the same judge presides over both the original trial and the postconviction .proceeding — as is the case here — and finds that, under the second prong of Strickland, trial counsel’s errors would not have resulted in prejudice, “[w]e afford the experienced judge’s ruling ‘considerable weight.’” Washington v. State, 95 So.3d 26, 53 (Ala.Crim.App.2012) (emphasis added) (affirming the circuit court’s denial of Washington’s postconviction ineffective-assistance-of-counsel claim by applying .the “considerable weight” standard). See also State v. Gamble, 63 So.3d 707, 721 (Ala.Crim.App.2010) (affirming the circuit court’s granting of Gamble’s postconviction ineffeetive-assistance-of-counsel claim by applying the “considerable weight” standard) (citing Francis v. State, 529 So.2d 670, 673 n. 9 (Fla.1988) (“Postconviction relief motions are not abstract exercises to be conducted in a vacuum, and this finding is entitled to considerable weight.”)). '
Marshall was represented at trial by Erskine Mathis and Linda Hall. Both attorneys testified at Marshall’s postconviction evidentiary hearing.
A. Guilt-Phase Ineffective-Assistance Claims
1.
Marshall contends that his trial counsel were ineffective because, -he says, his trial counsel “failed-to adequately procure the necessary experts to challenge the State’s case.”- (Marshall’s brief, p. 82.) Specifically, Marshall contends that his trial counsel “fail[ed] to secure a forensic pathologist who could rebut State expert Dr. William Shores, who testified that a tear found in [Alicia’s] vaginal wall occurred' within 24-48 hours of her death.” (Marshall’s brief, p. 82.) Marshall, however, failed to demonstrate that his trial counsel’s performance was, in fact, deficient.
This Court has held:
“ ‘[H]ow to deal with the presentation of an expert witness by the .opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forgo cross-examination and/or to forgo development of certain expert opinion, is a matter of trial strategy which, -if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim.’ ’’
Daniel v. State, 86 So.3d 405, 426 (Ala.Crim.App.2011) (quoting Thomas v. State, 284 Ga. 647, 650, 670 S.E.2d 421, 425 (2008) (citations omitted)) (emphasis added).
Mathis, Marshall’s trial counsel, testified at the evidentiary hearing that, although he knew that the State was going to offer forensic evidence as a part of its case-in-chief, he did not hire an independent forensic expert to rebut the'State’s expert. Mathis stated that he did not think hiring a forensic expert Was “pertinent” and that “if [he] had -thought it was- pertinent, [he] would have hired somebody.” Mathis testified that, although he did not have an independent recollection of Dr. Shores’s testimony, the trial transcript demonstrated that Dr.-Shores testified that Alicia had a “small mucosal tear” in her vagina and that Dr. Shores further testified that the tear . - -
*584 “ ‘raised the question of, has there been sexual abuse. .That’s all it-.does. I’m not an expert in that area. I mean,- the occasional sexual abuse I see, that I can deal with easily, are the ones like where the vagina has been perforated by some-: thing and you’ve got peritonitis, and somebody, obviously, died from that. .A small lesion like this, all I co.uld do is raise the question up. I refer those to people that are much more of an expert in that area than I am. It does raise the question. It does not answer it.’ ”
(R. 166 (quoting a portion of Dr. Shores’s testimony in the trial transcript).) Mathis then conceded that “if [he] had’ it' to do again” he would have hired ah expert to review Dr. Shores’s report and that he “can’t give ah explanation as to' why” -he did not do so because, he said, he “just do[esn’t]' remember.” (C. 167.)
On cross-examination, however, Mathis testified that one reason he did not hire an expert to rebut Dr'. Shores’s téstimony’was because “[he] didn’t have any reason to hot believe” Dr. Shores’s testimony. Mathis also testified that he would have, had to explain where the vaginal tear came from and that he
“didn’t want to bring it up because it was a fifteen-yeaTrold child, because she was dead, because it’s a very sensitive issue. [He] could have brought that up anyway, but [he] didn’t because of all of those things. [He], just felt like, the negatives outweighed the positives and [he] left it alone,” :
(R. 191.) Mathfe) further stated that he “didn’t .want, .to. be cast in the mold of somebody who comes up here speaking ill of a dead child.” (R. 192.) .
An examination of the record on direct appeal demonstrates .that, during opening statements, Mathis conceded 'to the jury that he expected the evidence to show, that Marshall “admitted he killed the child.” (Record on direct appeal, R. 252.) Mathis explained, however; that he also believed the evidence would show .that Marshall “had no sexual contact whatsoever, with Alicia” and that he would- “prove this through the coroner and through a forensics examiner who- does DNA testing,” (Record on direct appeal, R. 252.) Indeed, the record on direct appeal establishes that Mathis .thoroughly cross-examined Dr, Shores with.regard,to'the vaginal tear by calling into question the cause of the tear and by establishing that there was no vaginal trauma. Additionally, Mathis had Dr. Shores explain that he collected toxicological evidence, which he submitted for DNA testing. ’ Mathis was also able to’ establish through State witness Carl Maütereí, a forensic scientist, that the toxicological evidence that was collected excluded Marshall “as a potential donor.”
Although Mathis testified at the eviden-tiary hearing that, in hindsight, he should have hired an expert -witness to challenge Dr. Shores’s testimony, we are required to avoid using hindsight to evaluate Mathis’s conduct and, instead, must evaluate Mathis’s conduct “from [his] perspective at the time.” Strickland, 466 U.S. at 689. Here, Mathis’s decision to not hire an independent forensic pathologist was a reasonable strategic decision. The testimony at the evidentiary hearing indicated that Mathis chose not to present counter-expert testimony because he did not believe that he had a reason to doubt Dr. Shores’s assessment and he did not want to have to explain the presence of the vaginal tear because doing so, he thought, would have required him to impugn the character of a deceased child. Additionally, the record on direct appeal supports the conclusion that Mathis’s decision to not hire an expert to challenge Dr. Shores’s testimony was a reasonable strategic decision because Mathis challenged Dr. Shores’s testimony through, cross-examination.
*585 Although. Marshall’s Rule 32 counsel would have taken a different approach, because Mathis’s decision to not hire a forensic pathologist to challenge Dr. Shores’s testimony was reasonable, Mathis’s strategic decision to challenge Dr. Shores’s testimony through cross-examination “ ‘cannot be the basis for a successful ineffective assistance of counsel claim.’” Daniel, 86 So.3d at 426.
Marshall argues in his brief on appeal that Dr. George R. Nichols II could have been retained by Marshall’s trial counsel to rebut the State’s expert witness. The circuit court, however, did not allow Marshall to present Dr. Nichols’s testimony during the evidentiary hearing, finding that “the issue ... is, not what [Dr. Nichols] would say, but whether or not Mr. Mathis should have employed or sought out”-' Dr. Nichols.[4] Marshall, however, proffered Dr. Nichols’s testimony by sworn affidavit. (Second Supplemental Record on Appeal, C. 350-53.)
Marshall contends that Dr. Nichols would have testified that,
“based on his review of the trial testimony, the autopsy report, and his ‘education, experience, .knowledge, background, training and skills, in the field of forensic pathology, it is [his] opinion that Dr. Shores did. not have an adequate foundation for opining that the genital lesion on [Alicia] occurred 24-48 prior to his examination of [Alicia], because he did not perform a histological examination of the tissue samples of the lesion.’ ”
(Marshall’s brief, p. 87.) Further,. Marshall- asserts that Dr. Nichols would have been available to testify at his trial;[5] it is well settled, however, that
“‘the mere fact a defendant can find, years after the fact, a[n] ... expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial. See, e.g., Horsley v. Alabama, 45 F.3d 1486, 1495 (11th Cir.1995)
*586 (“That experts were found who would testify favorably' years later is irrelevant.”); Elledge v. Dugger, 823 F.2d 1439 (11th Cir.1987).’ ”
Daniel, 86 So.3d at 423 (quoting Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir.1997)).
Accordingly, the circuit court did not err when it denied this claim, finding:
“The sub-claim that trial counsel were ineffective 'for failing to hire a forensic pathologist to challenge the State’s theory that 'Alicia suffered sexual 'abuse within the 48 hours prior to her murder is denied because Marshall has- failed to meet his burden of proof. Marshall failed to establish that trial counsel’s decision not to hire a forensic pathologist constituted deficient performance under Strickland. Mathis was Marshall’s. primary trial counsel. Mathis had extensive relevant experience prior to representing Marshall. His experience-included the representation of ‘over 30’ defendants facing capital murder charges prior to Marshall’s case. (EH. 178.) This court has had extensive experience with Mr. Mathis. This court knows him to be a fine attorney. Mathis fe. definitely one of the better trial attorneys available in this circuit to handle death penalty cases. This court knows him to be extremely conscientious in all cases that he handles, whether they are capital cases or not. He, like all lawyers makes mistakes but no attorney tries the perfect case. However, the law does not require perfection. .
. “Mathis -testified at the evidentiary hearing that, ‘had [he] thought it was pertinent, [he] would have hired [a forensic pathologist for the trial].’ (EH. 164-65.) Mathis’s testimony indicated that he did not think that a forensic pathologist was necessary because he had no reason to doubt the State expert’s conclusions regarding the timing of the vaginal tear and that he thought it was not in Marshall’s best interest to impugn the-reputation of the 15-year-old victim by suggesting that she was sexually active without' presenting compelling evidence of that fact, which trial counsel did not have. (EH. 189-92.) T did not want to be cast in the mold of somebody who comes up here speaking ill of a dead child,’ said Mathis. (EH. 192.) Mathis testified that, with regard to challenging .the State’s, forensic evidence by suggesting that the victim might havé had sex with her boyfriend around the time of the murder, he< ‘felt the negatives outweighed the positives and [he therefore] left it alone.’ (EH. 191.) Because Marshall failed to establish that no reasonable lawyer would have failed to hire a forensic pathologist in. this case,- he failed to meet his. burden of proof. Therefore, this' sub-claim is denied.”
(C. 1001-03.)
2.
Marshall contends that his trial counsel were ineffective for “failfing] to make an independent investigation of Marshall’s case” because, he says, his trial counsel failed to “investigate evidence provided by Marshall that contradicted the State’s assertion it was given permission to search Marshall’s residence by [Tonya], a purported tenant under the lease.” (Marshall’s brief, p. 88.) Specifically, Marshall contends that,
“[a]t the time of his arrest, [he] was separated from [Tonya], and the two were living in different apartments. [He] remained in the former residence he and [Tonya] once shared, and [Tonya] moved to a different apartment complex. Despite knowing that [Tonya] did not live with [him], trial counsel did nothing to attempt to demonstrate that the police had no legal permission to enter and
*587 search Marshall’s apartment on the night of his arrest. -[His] trial counsel ‘never went to his apartment and asked for a copy of his lease,’ although [trial] counsel could have asked the court for a subpoena to obtain his lease.”.
(Marshall’s brief, p. 89 (citations omitted).) In other words, Marshall contends that his trial counsel were ineffective for failing to obtain a copy of Marshall’s lease, which, he says, would demonstrate that Tonya was not a tenant on the lease and, therefore, had no authority to give law enforcement permission to enter Marshall’s apartment. Marshall, however, failed to satisfy his burden of proof as to this claim. See Rule 32.8, Ala. R.Crim. P,
At the evidentiary hearing, Marshall questioned both Mathis and Hall about Marshall’s lease. Specifically, Marshall questioned Mathis as follows:
“[Marshall’s' Rule 32 counsel]: Did you ever think to get a lease, or request a copy of [Marshall’s] lease?
“[Mathis]: If it wasn’t in that file I — I don’t know if ! did or not. If it was in the file, I did. If it wasn’t in the file, I didn’t.
“[Marshall’s Rule 32 counsel]: It’s not in the file.
“[Mathis]: Then, I didn’t.
“[Marshall’s Rule 32 counsel]: Okay. If you had found out that Tonya Bentley had, in fact, been removed from the lease, would you have used that in arguing for a lack of consent to the search?
“‘[Mathis]: Yes.”
(R2. 169-70.) Marshall then questioned Hall as follows:
“[Marshall’s Rule 32 counsel]: Ms. Hall, did you ever acquire a lease from Mr. Marshall’s apartment?
“[Hall]: I personally acquired it?
“[Marshall’s Rule 32 counsel]: Did you?
“[Hall]: Go to his apartment and acquire a lease?
“[Marshall’s ' Rule 32 counsel]: Did you get a- lease from Mr. Marshall pertaining to his living arrangement at the time of this crime?
“tHall}: ‘No, sir. I never went to his apartment and asked for a copy of his lease, no.
“[Marshall’s Rule 32 counsel]: Okay. Could you have done that?
“[Hall]: Yes, sir.”
(R3. 45.) Additionally, Marshall admitted into evidence as exhibits three letters to support his claim — Exhibits 29, 30, and 31 (C. 4947, 4951-52), which established that Engel Realty Company, L.L.C. (“Engel”), became “the third party fee manager for Arboretum Apartments” on February 7, 2005, and Marshall’s apartment was, on that date, “vacant on the rent roll used at closing,” that Engel had “been unable to locate any previous resident files,” and that Love Properties, Inc., the previous owner of the property, provided “a list of the managerial and office employees at the Arboretum Apartments during the years 2004 to 2005.” Marshall, however, did not produce the alleged lease purporting to remove Tonya as a tenant of the property — or any other evidence demonstrating that Tonya was no longer a tenant on the lease.
Thus, even assuming that Marshall’s trial counsel were deficient, for failing to obtain Marshall’s “new” lease, Marshall failed to prove, that he suffered any prejudice from his trial counsel’s failure. That is, Marshall failed to show that had his trial counsel obtained the lease it would have, in fact, established that Tonya was no longer listed as a tenant on the lease. Accordingly, the circuit court did not err in denying this claim, finding:
. “As to the sub-claim regarding the purported ‘new’ lease, in Thomas v. State, 766 So.2d 860, 892 (Ala.Crim.App.1998), overruled on other grounds, 766 *588 So.2d 975 (Ala,2000), the Alabama Court of Criminal Appeals held that -claims of failure to .investigate ^must show with specificity what information would have been obtained with investigation, and whether, assuming the evidence is admissible, its admission would have produced a different result.’ Because Marshall failed to produce the purported ‘new1 lease, or any other evidence that it ever existed, this issue would have had no affect on the outcome of his trial. Hence, this sub-claim is denied.”
(C. 1003-04.)
3.
Marshall also contends, in passing, that “the cumulative effect of [his trial] counsel’s errors amounted to. ineffective assistance of counsel in violation of [his] constitutional rights.” (Marshall’s brief, p. 91.) Although we question whether Marshall’s cursory argument satisfies Rule 28(a)(10), Ala. R.App. P., Marshall’s claim is without merit.
“As this Court ... stated in Brooks v. State, 929 So.2d 491, 514 (Ala.Crim.App.2005):
‘“Other states and federal courts are not in agreement as to whether the “cumulative effect” analysis applies to Strickland claims. As the Supreme Court of North Dakota noted in Garcia v. State, 678 N.W.2d 568, 578 (N.D.2004):
“ ‘ “Garcia argues that even if trial counsel’s individual acts or omissions are insufficient to establish he was prejudiced, the cumulative effect was substantial enough to meet Stricklandf s test. See Williams v. Washington, 59 F.3d 673, 682 (7th Cir.1995) (‘In making this showing, a petitioner may demonstrate that the cumulative effect of counsel’s individual acts or omissions was substantial enough to meet Strickland ’s test’); but see Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir.1990) (‘cumulative error does not call for habeas relief, as each habeas claim must stand or fall on -its own’).”
“ ‘See also Holland v. State, 250 Ga.App. 24, 28, 550 S.E.2d 433, 437 (2001) (“Because the so-called cumulative error doctrine is inapplicable, each claim of inadequacy must be examined independently of other claims, using the two-prong standard of Strickland v. Washington.” (footnote omitted)); Carl v. State, 234 Ga.App. 61, 65, 506 S.E.2d 207, 212 (1998) (“Georgia does not recognize the cumulative error rule.”); Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir.1998) (“Not surprisingly, it has long been the practice of this Court to . individually assess claims under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See, e.g., Hoots v. Allsbrook, 785 F.2d 1214, 1219 (4th Cir.1986) (considering ineffective assistance claims individually rather than considering their cumulative impact.).”).
“ ‘We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective' assistance of counsel. However, the Alabama Supreme Court has held that the cumulative effect of prosecutorial miscon•duct necessitated a new trial in Ex parte Tomlin, 540 So.2d 668, 672 (Ala.1988) (“We need not decide whether either of the two errors, standing alone, would require a reversal; we hold that the cumulative effect of the errors probably adversely affected the substantial rights of the defendant and seriously affected the fairness and integrity of the judicial proceedings;”). Also, in Ex parte Bryant, [951] So.2d [724] (Ala.2002), the Supreme Court *589 held that, the cumulative effect of errors may require reversal,
“ ‘If we were to evaluate the cumulative effect of the ineffective assistance of counsel claims, we would find that Brooks’s substantial rights were not injuriously affected. See Bryant and Rule 45, Ala. R.App. P.’ ”
McNabb v. State, 991 So.2d 313, 332-33 (Ala.Crim.App.2007).
Here, if we were to'evaluate the cumulative effect of the instances of alleged ineffective assistance of counsel, we would find that Marshall’s substantial rights had not been injuriously affected,: because we have found no error in the instances argued in the petition. See Ex parte Woods, 789 So.2d 941, 943 n. 1 (Ala.2001) (“A correct statement of the law would be that, when no one instance amounts to error at all (as distinguished from error not sufficiently prejudicial to be reversible), the cumulative effect cannot warrant reversal. In other words, multiple nonerrors obviously do not require reversal.”). Therefore, Marshall is not entitled to any relief on this claim.
B. Penalty-Phase Ineffective-Assistance Claims
Marshall contends that his trial counsel were ineffective during the penalty-phase of his trial.
1.
Marshall contends that his trial counsel were ineffective “for failing to present evidence to the court that'Marshall was not on probation in the State of Florida at the time of the incident.” (Marshall’s brief, p. 33.) -Specifically, Marshall contends that, although his -trial counsel “knew” that Marshall was not on probation at the time Alicia was murdered and trial counsel made that argument in.the trial court, Marshall’s trial counsel “did not possess any documentation supporting this assertion” and “made no attempts to obtain any such documentation.” (Marshall’s brief, p. 34.)
Marshall, in both--his first amended Rule 32 petition and his second amended Rule 32 petition, alleged the following: -
“Defense counsel ... failed to object to the submission of incomplete evidence to the jury when he allowed the State to admit as evidence the conviction for the burglary with intent to commit assault as.evidence that the 27 year probation on Mr. Marshall was still in existence, when defense counsel knew it had ended. (R. 757-58). Although defense counsel argued to the court that the probation had ended, he failed to present any evidence of the termination of that probation to the jury, even though he easily could have.”
(C. 195,575.)
At the portion of the evidentiary hearing held in February. 2010, Marshall questioned Mathis-regarding Marshall’s ■ past criminal history as follows:
“[Marshall’s Rule 32 counsel]: You mentioned this earlier. You mentioned that you make it, as a practice, to get all of your client’s criminal history?
' “[Mathis]: I try to.
, “[Marshall’s Rule 32 counsel]: 'All right. Did you get all of [Marshall’s] records regarding his past criminal history?
“[Mathis]:, I believe I did.
“[Marshall’s Rule 32 counsel]: Okay. That includes probation records?
“[Mathis]: I had those records that I obtained through the District Attorney’s Office, and I talked to [Marshall] about them. Based on what I had, and the conversations I had with them, I made the assumption that I had everything.
“[Marshall’s Rule 32 counsel]: Okay.You didn’t,-perhaps, call another state to verify that or get any other documents?
*590 “[Mathis]: No.
“[Marshall’s Rule 32 counsel]: Okay. Do you recall that one of the aggravating circumstances in [Marshall’s] case was that he committed murder while under a sentence of imprisonment, as .Your Honor noted in her sentencing order on page 25, specifically related to a sentence of probation from Florida?
“[Mathis]: Yes.
“[Marshall’s Rule 32 counsel]: That was because of an incident involving a woman named Sharon Bernard where he was sentenced to three years; and then, I believe, a twenty-seven year concurrent probation sentence?
“[Mathis]: That sounds right, but it’s been a long time.
“[Marshall’s Rule 32 counsel]: Mr. Mathis, let me pull you to the trial record on page 759. Would you please take a gander at-this’and look at the part— the second paragraph of. your name? This is a conversation that you, Your Honor, and [the District Attorney] had regarding the appropriateness of the Florida sentence.
“[Mathis]: Okay. I’m reading it.
“[Marshall’s Rule. 32 .counsel]: Does that indicate that Mr. Marshall felt like he was not on probation from the state of Florida when the murder of Alicia Bentley occurred?
“[Mathis]: It certainly indicates that I didn’t think he was.
“[Marshall’s Rule 32 counsel]: Okay.
“[Mathis]: I don’t know whether he did or not.
“[Marshall’s Rule 32 counsel]: Do you suggest in that paragraph that there’s a document out there saying that he’s not on probation, but you don’t have a copy of it?
“[Mathis]: Well, I suggested that.”
(R2.154-56.)
Thereafter, Marshall offered documents from the Tennessee Department of Corrections to be admitted as evidence to demonstrate that Marshall was not on probation in Florida at the time he murdered Alicia. The State, however, objected to its admission, which the circuit court sustained during the following exchange:
“[Marshall’s Rule 32 counsel]: Your Honor, this record wasn’t presented in the trial court. It talks about specific aggravating circumstances. It talks about Mr. Marshall being transferred to Tennessee when he moved to Tennessee, and the fact that he’s no longer on probation when this crime occurred.
“THE COURT: But, [Marshall’s Rule 32 counsel], if you’re sentenced by a Florida judge, a Florida judge sentences him, and I think Florida has unusually long probationary periods. State sentences him 'to a 15-year probationary period, but they allowed his probation to be transferred. Well, it can be supervised. The' supervision may have ceased, but that, under the law that I know in the state of Alabama, does not necessarily cease his probation.
“Again, the Florida records would control if the conviction is out of Florida....
“The judge that sentenced him has control. It is a bureaucratic or administrative supervision that the probation offices perform.
“Now, do you have the Florida — that was admitted at trial, was it not?
“[Marshall’s Rule 32 counsel]: It was, but it doesn’t talk about — it talks about the fact of Mr. Marshall being put on probation, but I don’t think it discusses the actual supervision, or the transfer of probation- to Tennessee. Those are not in the record. Your Honor.
“[Assistant Attorney General]: But that would be irrelevant to show that— what they’re trying to show is that he was not on probation. •
*591 “THE COURT: Right.
“[Assistant Attorney General]: To show that, they’re going to have to show something from Florida saying that he was not on probation. Not something from Tennessee saying that he was no longer being supervised,, as Your Honor pointed out.
“So, it’s irrelevant to the point that they’re trying to make.
“THE COURT: I would agree. You’ve got it for your record. Aid, of course, it will go down as being offered and not admitted.
“But I think we’re talking apples and oranges1 here, [Marshall’s Rule 32 counsel]. That judge in Florida is the judge that has control over the case and the mere geographic location of the defendant does not terminate that, in my opinion.
“So, I will sustain the State’s objection.’h
(R2. 159-61.) At the conclusion of the February 2010 evidentiary hearing, the circuit court continued the hearing until April 1, 2010, so Marshall’s Other .trial counsel, Linda Hall, who was no longer residing in Alabama, could testify. .
At the April 1, 2010, evidentiary hearing — before Hall testified — Marshall’s Rule 32 counsel produced an order from the Circuit Court of the Eighteenth Judicial Circuit in Seminole County, Florida, dated March 18, 20Í0, finding that Marshall’s sentence that included a term of 27 years’ probation was modified on September 19,1990, and replaced with a sentence of 2 years’ “Community Control” and that the 2-year “Community Control” sentence was modified on June 21, 1991, and Marshall was ordered to serve the remainder of the 2-year sentence on probation, which was transferred to Tennessee, and that Marshall successfully completed his probation in Tennessee. (Supplemental Record on Appeal, C, 403-04.) The order concluded that Marshall’s probation terminated on September 18,1992. (Supplemental Record on Appeal, C. 404.)
Because that order was hot issued until after Marshall’s February 2010 evidentiary hearing, the'State argued that Marshall was “essentially [a]rríénding [his petition] on the fly.”- (R3. 9.) Marshall’s Rule 32 counsel explained:
“Judge, I do think that our petition indicated as part of our ineffective assistance of counsel claim that trial counsel advised the judge during the sentencing phase that he was — that his understanding that Mr. Marshall was not on probar tion, and he thought he had a document, but did not.
“So, our allegation is that he should have done more to obtain that document. Just to give — it is part of our ineffective assistance of counsel claim. To give the Court a little bit of background, all we did here was call the lawyer down in Florida and sent him the Florida records that were already admitted at trial.
He reviewed the récords and said in Florida — he explained exactly what happened, and that there were two different judges involved. The second judge went in and changed the' probation period from 23 years [sic] to 2 years community service. " ‘ • ;
“And that what happens in Florida is, once that term is served, the probation is up, that-it’s just an administrative way to terminate ah order.
“In fact, [the Florida lawyer] said to me, you know, it’s sort of odd that y’all need an order, but I can understand. I did not feel, based on the prior hearing, that an affidavit from a lawyer in Florida was going to cut. it.
[[Image here]]
“So [the Florida lawyer] filed a motion for clarification. Attached to our filings, not only are the orders that were en *592 tered in by the judge, but also the- minutes of the hearing. As indicated on the minutes, the State attorney for Florida . did attend the hearing on the motion for .clarification. That if there was no jurisdiction, that would have been argument that the State would have made. But there was a hearing and the State’s attorney was present and it was entered.
“And, so, we do think that goes to our ineffective assistance of counsel, because nothing would have prevented the trial counsel from making a phone call just like we did and getting the document that was needed.”
(R3. 9-11.)' Marshall then questioned Hall regarding Marshall’s past criminal history as follows:
“[Marshall’s Rule 32 counsel]: Can you read the highlighted portion at the top of the page, please?
“[Hall]: ‘The Court hereby states this — stays and withholds the imposition of sentencing as to count,’ and it’s blank. And it says, ‘and places the defendant on community control for a, period of two years under the supervision of the Department of Corrections, according to the conditions set- forth in this order.’
“[Marshall’s Rule 32 counsel]: Okay. And as we discussed at the beginning of this hearing, as well as what was in play at trial, one of the aggravating factors with Mr. Marshall was that he committed this crime while under a sentence of imprisonment related to that conviction in Florida?
“[Hall]: I can’t recall, sir, I’m only basing it on what I just read to you.
“[Marshall’s Rule 32 counsel]: Okay. If you had his criminal records and reviewed them, did you ever look at- that document and think I’m not sure what that is, let me call somebody and find out? :
“[Hall]: I’m not going to speculate at this time. Because, again, I’m reading to you what you asked me to read.
“[Marshall’s Rule 32 counsel]: Okay. Were you ever advised- that Mr. Marshall was not on probation in Florida?
“[Hall]: I can’t recall, sir.
“[Marshall’s Rule 32 counsel]: Did you ever try to get any more documents?
“[Hall]: I don’t recall, sir.
“[Marshall’s Rule 32 counsel]: Okay. And you never contacted anyone to help get documents?
“[Hall]: . Under these circumstances, I’m not going to speculate, because we did. what we was supposed to have done in this case.
“[Marshall’s Rule 32 counsel]: Could you have done that?
“[Hall]: Of course. We would have if we felt that that was something that was given to us at the time of discovery, or by way of independent investigation.
“[Marshall’s Rule 32 counsel]: Okay. Why didn’t you think it was necessary?
“[Hall]: I don’t say it is not necessary, because we do everything that’s fair and proper, according to what we have provided tó us. If we had it provided to us, then that’s what we did.
[[Image here]]
“[Marshall’s Rule 32 counsel]: If there was an explanation for the fact that' Mr. Marshall may not have been on probation at the time of this offense, would that have been important for the judge and jury to know?
“[Hall]: I don’t even understand the question, what you’re saying. Because everything we felt proper and necessary in this case, we presented it to the judge, as. well as the jury.
“So, if it’s a part of our files, everything, mitigating, as well as aggravating *593 circumstances, we present them because we know the seriousness of these .type of cases. It’s a part of our file. We did our job. We couldn’t do any more.
“[Marshall’s Rule 32 counsel]: Okay. But you never made a phone, call about Mr. Marshall’s revocation and probation?
“[Hall]: I don’t recall, sir.
“[Marshall’s Rule 32 counsel]: And you never found out about community control?
“[Hall]: If it was a part of the file, we felt it was necessary and proper, without being an over grasp of something that has no relevance to the case, no, we did not do it. We don’t do things that are inappropriate.
“[Marshall’s Rule 32 counsel]: Okay. So, finding out that Mr. Marshall — finding out whether or not Mr. Marshall was on probation didn’t matter? Is that what you’re saying?
' “[Hall]: Finding out he was on probation?
“[Marshall’s Rule 32 counsel]: That he was not on probation.
“[Hall]: For what?
“[Marshall’s Rule 32 counsel]: For the crime in Florida that was an aggravating circumstance in this case.
“[Hall]: Sir, I can’t recall. This is too old now. If Your Honor would like for me to, I can take the time to read through this and make a more—
“THE COURT: No. I think the question has been answered. Let’s move on.”
(R3. 41-45.) Thereafter, Marshall moved to admit, without objection, the Florida court order indicating that Marshall had completed his. probation in 1992.. (R3. 52.)
As set out above, Marshall contends that his trial counsel were ineffective for failing to obtain documentation demonstrating that Marshall was no longer on probation at the time Alicia was murdered. Although we question whether Marshall’s.trial counsel were deficient for failing to obtain an order from a Florida court that was not issued until approximately 5 years after Marshall was sentenced and that Marshall’s Rule 32 counsel did not even possess until sometime between the February evidentiary hearing and the April evidentiary hearing, Marshall failed to demonstrate that he suffered, prejudice from his tidal counsel’s alleged deficiency.
This Court has recognized:
“ ‘ “ ‘Even if an attorney’s performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that “there is a reasonable probability that] but for counsel’s unprofessional errors, the result oí the proceeding would have been different. A reasonable probability is a probability sufficient to úndermine confidence :in the 'outcome.” [Strickland,] 466 U.S. at 694, 104 S.Ct. at 2068.’
“ ‘ “Daniels [v. State ], 650 So.2d [544,] 5521 (Ala.Crim.App.1994).]
“ ‘ “ When a defendant challenges a death sentence such as the.one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’
““Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, quoted in Thompson v. State, 615 So.2d 129, 132 (Ala.Cr.App.1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993).
[[Image here]]
“ ‘Bui v. State, 717 So.2d 6, 12-13 (Ala.Cr.App.1997), cert. denied, 717 So.2d 6 (Ala.1998).’ ”
*594 Broadnax v. State, 130 So.3d 1232, 1247 (Ala.Crim.App.2013) (quoting Dobyne v. State, 805 So.2d 733, 742-44 (Ala.Crim.App.2000), aff'd, 805 So.2d 763 (Ala.2001)).
The circuit court, in its order denying Marshall’s Rule 32 petition, concluded that Marshall suffered no prejudice from his trial counsel’s failure to obtain the Florida order,[6] explaining:
“Out of an abundance of caution, this Court must also look to prejudice. ' Assuming that the jury had not considered the Alabama Code Section 13A-5-49(l) aggravating circumstance in their sentencing .deliberations, they very likely would have recommended a sentence of death because there were two other aggravating circumstances proved by the State at trial and there was no mitigation evidence presented. This Court holds that it would have, sentenced Marshall to death based on the weight given to the other two aggravating circumstances:. (1) the Alabama Code Section 13A-5-49(2) aggravating circumstance that Marshall had previously been convicted of a felony involving the use or threat of violence to the person on two prior occasions and (2) the Alabama Code Section' 13A-5-49(4) aggravating circumstance that Marshall was engaged in the commission of a burglary at the ’ time' of the commission of the capital offense. This court does not find that trial counsel’s failure to obtain a Florida order challenging the State’s contention that Marshall was on probation at the time of the murder affected Marshall’s death sentence, and as such Marshall has failed to establish prejudice.”
(C. 1024-25.)
At trial, the State proved, and the trial court found, the existence of three aggravating circumstances: (1) that the capital offense was committed while Marshall was under sentence of imprisonment; (2) that Marshall had previously been convicted of a felony involving the use or threat of violence to the person; and (3) that Marshall was engaged in the commission of a burglary at the time the capital offense was committed. Additionally, the trial court found that no' statutory mitigating circumstances existed and that there were no nonstatutory mitigating circumstances.
We have thoroughly reviewed the record from Marshall’s direct appeal, and we agree with the circuit court’s conclusion that even if evidence had been presented to the jury that Marshall murdered Alicia while he was not under a sentence of imprisonment, such evidence would not have altered the balance of the aggravating and the mitigating circumstances in this case. This is especially true in this case, considering that Marshall had previously been convicted of a felony involving the use or threat of violence to the person, a crime in which Marshall broke into a dwelling where the young woman (his ex-girlfriend) was staying with a friend and' her family; he assaulted and threatened to kill her; he stabbed (with a butter knife) a man who *595 tried to get her away from him as he beat the young woman and dragged her from the residence; and he kidnapped the young woman, drove her to another town, and threatened to kill her. Accordingly, the circuit court did not err when it found that Marshall had failed to prove that he was prejudiced by his trial counsel’s failure to obtain from a Florida court an order explaining that Marshall’s probation was terminated in 1992.
2.
Marshall contends that his trial counsel were ineffective for failing to “conduct a reasonable investigation into available mitigation evidence and witnesses.” (Marshall’s brief, p. 37.)' Specifically, Marshall contends that his trial counsel were unreasonable for “relying solely on [Alfred] Armour[, an investigator hired by Marshall’s trial counsel,] and Dr, [Kimberly] Ackerson for mitigation” (Marshall’s brief, p. 41), and he contends that his trial counsel “ignor[ed] the wealth of mitigation evidence right before them and deprived] the jury of this evidence.” (Marshall’s brief, p. 49.) Marshall also argues that his trial counsel were ineffective for “not hiring a neuropsychologist” (Marshall’s brief, p. 54) and for not hiring a mitigation expert. Marshall further argues that the “failure to present mitigation evidence was prejudicial to Marshall.”[7]
Initially, we note that, although Marshall’s trial counsel did not present any mitigation evidence during the penalty phase of his trial, Marshall does not argue that his trial counsel failed to conduct any investigation but, rather, that his trial counsel failed to conduct an adequate investigation.
This Court has explained:
“ ‘ “ ‘[F]ailure to investigatepossible mitigating • factors and failure to present mitigating evidence at sentencing can constitute ineffective assistance of counsel under the Sixth Amendment.’ Coleman [v. Mitchell], 244 F.3d [533] at 545 [(6th Cir.2001)]; see also Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Our circuit’s precedent has distinguished between counsel’s complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel’s failure to "conduct an adequate investigation where the presumption of reasonable performance is more difficult to overcome:
“¡«.¡[T]he cases where" this court has granted the writ for failure of counsel to "investigate potential mitigating evidence' have been limited to those situations in which defense counsel have totally failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner’s dissatisfaction with the degree of his attorney’s investigation, the presumption of reasonableness imposed by Strickland will be hard to overcome.’
“ ‘ “Campbell v. Coyle, 260 F.3d 531, 552 (6th Cir.2001) (quotation omitted) see also Moore v. Parker, 425 F.3d 250, 255 (6th Cir.2005). In the present case, defense counsel did not completely fail to conduct an investigation for mitigating evidence. Counsel spoke with Beuke’s *596 parents prior to penalty phase of trial (although there is some question as to how much time counsel spent preparing Beuke’s parents to testify), and presented his parents’ testimony at the sentencing hearing. Defense counsel also asked the probation department to conduct a presentence investigation and a psychiatric evaluation. While these investigatory efforts fall far short of an-exhaustive search, they do not qualify as a complete failure to investigate. See Martin v. Mitchell, 280 F.3d 594, 613 (6th Cir. 2002) (finding that defense counsel did not completely fail to investigate where there was ‘limited contact between defense counsel and family members,’ ‘counsel requested a pre-sentence report,’ and counsel ‘elicited the testimony of [petitioner’s] mother and grandmother’). Because Beuke’s attorneys did not entirely abdicate their duty to investigate for mitigating evidence, we must closely evaluate whether they exhibited specific deficiencies that were unreasonable under prevailing professional standards. See Dickerson v. Bagley, 453 F.3d 690, 701 (6th Cir.2006).”
‘“Beuke v. Houk, 537 F.3d 618, 643 (6th Cir.2008). “[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying heavy measure of deference to counsel’s judgments.” Wiggins, 539 U.S. at 521-22. “A defense attorney is not required to investigate all leads....” Bolender v. Singletary, 16 F.3d 1547, 1657 (11th Cir.1994). “A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance.” Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir.1992). “The attorney’s decision not to investigate must not be evaluated-with the benefit of hindsight, but accorded a strong presumption of reasonableness.” Mitchell v. Kemp, 762 F.2d 886, 889 (11th Cir.1985).
“ ‘ “The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made, by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.”
“ ‘Strickland v. Washington, 466 U.S. at 691. “The reasonableness of the investigation ■ involves ‘not only the quantum of evidence already known to counsel, but'also whether the known evidence would lead a reasonable attorney to investigate further.’” St. Aubin v. Quarterman, 470 F.3d 1096, 1101 (5th Cir.2006), quoting in part Wiggins, 539 U.S. at 527.’
“Ray[v. State], [80] So.3d [965] at [984 (Ala.Crim.App.2011) ]. In addition,
“ ‘ “[W]e ‘must recognize that trial counsel is afforded broad authority in determining what evidence will be offered in mitigation.’ State v. Frazier (1991), 61 Ohio St.3d 247, 255, 574 N.E.2d 483. We also reiterate that post-conviction proceedings were designed to redress denials or infringements of basic constitutional rights and’ were not intended as an avenue for simply retrying the case. [Laugesen] v. State, [(1967), 11 Ohio Misc. 10, 227 N.E.2d 663]; State v. Lott, [ (Nov. 3, 1994), Cuyahoga App. Nos. 66338, 66389, 66390]. Fur *597 ther, the failure to present evidence which is merely cumulative to that which was presented at trial is, generally speaking, not indicative ,of ineffective assistance of trial counsel. State v. Combs (1994), 100 Ohio App.3d 90, 105, 652 N.E.2d 205.”
‘“Jells v. Mitchell, 538 F.3d 478, 489 (6th Cir.2008).
“ ‘ “ ‘[C]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel’s strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively.’ Haliburton v. Sec’y for the Dep’t of Corr., 342 F.3d 1233, 1243-44 (11th Cir.2003) (quotation marks and citations omitted); see Herring v. Sec’y, Dep’t of Corr., 397 F.3d 1338, 1348-50 (11th Cir.2005) (rejecting ineffective assistance claim where defendant’s mother was only mitigation witness and counsel did not introduce evidence from hospital records in counsel’s possession showing defendant’s brain damage and mental retardation or call psychologist who evaluated defendant pre-trial as having dull normal intelligence); Hubbard v. Haley, 317 F.3d 1245, 1254 n. 16, 1260 (11th Cir.2003) (stating this Court has ‘consistently held that there is “no absolute duty ... to introduce mitigating or character evidence” ’ and rejecting claim that counsel were ineffective in failing to present hospital records showing defendant was in ‘borderline mentally retarded range’) (brackets omitted) (quoting Chandler [v. United States], 218 F.3d [1305] at 1319 [ (11th Cir.2000) ]).”
“ ‘Wood v. Allen, 542 F.3d 1281, 1306 (11th Cir.2008). “The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy.” Hill v. Mitchell, 400 F.3d 308, 331 (6th Cir.2005).’
“Dunaway[ v. State, [Ms. CR-06-0996, Dec. 18, 2009]] — So.3d [-] at - [ (Ala.Crim.App.2009) ].
“Likewise^
“ ‘ “When claims of ineffective assistance of counsel involve the penalty phase of a capital murder trial the focus is on “whether “the sentencer ... would háve concluded that the balance of aggravating and mitigating circumstances did not warrant death.”’ Jones v. State, 753 So.2d 1174, 1197 (Ala.Crim.App.1999), quoting Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir.1992). See also Williams v. State, 783 So.2d 108 (Ala.Crim.App.2000). An attorney’s performance is not per se ineffective for failing to present mitigating evidence at the penalty phase of a capital trial. See State v. Rizzo, 266 Conn. 171, 833 A.2d 363 (2003); Howard v. State, 853 So.2d 781 (Miss.2003), cert. denied, 540 U.S. 1197 (2004); Battenfield v. State, 953 P.2d 1123 (Okla.Crim.App.1998); Conner v. Anderson, 259 F.Supp.2d 741 (S.D.Ind.2003); Smith v. Cockrell, 311 F.3d 661 (5th Cir.2002); Duckett v. Mullin, 306 F.3d 982 (10th Cir.2002), cert. denied, [538 U.S. 1004], 123 S.Ct. 1911 (2003); Hayes v. Woodford, 301 F.3d 1054 (9th Cir.2002); and Hunt v. Lee, 291 F.3d 284 (4th Cir.), cert. denied, 537 U.S. 1045 (2002).”
*598 “ ‘Adkins v. State, 930 So.2d 524, 536 (Ala.Crim.App.2001) (opinion on return to third remand). As we also stated in McWilliams v. State, 897 So.2d 437, 453-54 (Ala.Crim.App.2004):
“ ‘ “ ‘Prejudicial ineffective assistance of counsel under Strickland cannot be established on the general claim' that additional witnesses should have been called in mitigation. See Briley v. Bass, 750 F.2d 1238, 1248 (4th Cir.1984); see also Bassette v. Thompson, 915 F.2d 932, 941 (4th Cir.1990). Rather, the deciding factor is whether additional witnesses would have made any difference in the mitigation phase of the trial.’ Smith v. Anderson, 104 F.Supp.2d 773, 809 (S.D.Ohio 2000), aff'd, 348 F.3d 177 (6th Cir.2003). ‘There has never been a case where additional witnesses could not have been called.’ State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App.1993).” ’ ”
McWhorter v. State, 142 So.3d 1195, 1247 (Ala.Crim.App.2011) (quoting Hunt v. State, 940 So.2d 1041, 1067-68 (Ala.Crim.App.2005)). Additionally,
“ ‘before we can assess the reasonableness of counsel’s investigatory efforts, we must first determine the nature and extent of the investigation that took place.... ’ Lewis v. Horn, 581 F.3d 92, 115 (3d Cir.2009). Thus, ‘[although [the] claim is that his trial counsel should have done something more, we [must] first look at what the lawyer did in fact.’ Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir.2000).”
Broadnax, 130 So.3d at 1248.
Initially, we note — just as the circuit court did in its order denying Marshall’s Rule 32 petition — that •
“[t]he circumstances of this case are extraordinary. Marshall murdered Alicia Bentley, who was his step-daughter. However, because Marshall married his first cousin, Tonya Bentley, Alicia was not only Marshall’s step-daughter but also his first cousin once removed. Therefore, trial counsel were tasked with convincing Marshall’s family members to testify for Marshall during the penalty phase, where, to do so, would mean testifying in favor of the murderer • of another one of their family members.”
(C. 1004-05.)
Here, Marshall’s trial counsel retained two experts to conduct an investigation into possible mitigation evidence — Investigator Armour and Dr. Ackerson.
At the evidentiary hearing, Mathis testified that Investigator Armour was tasked with locating family members for mitigation. . Mathis stated that Investigator Armour provided him. with a letter, which was introduced by Marshall during the evidentiary hearing and admitted as “Petitioner’s Exhibit 3,” and provides:
“During my initial interview with [Marshall], he provided me with a list of names of family members and friends that might wish to speak on his behalf at his sentencing hearing. The list of names included several members of his family that reside outside the State of Alabama. Many of the addresses and telephone numbers were old and had change[d] from the time [Marshall] obtained them. .
“I have placed numerous calls .to relatives thought to be residing in Cross-ville, Tennessee, but was unable to get in contact with any of his siblings that were listed. After a number of attempts, I was able to contact Mr. William Marshall, Sr.[, Marshall’s father,] by telephone on at least three occasions during the course of the investigation. ■ [Marshall’s father] stated to me during each conversation that he was aware of *599 the case involving [Marshall. He] also stated to me that it is an unfortunate circumstance in which [Marshall] was involved in, but believes that if he did the crime, he needs to do the time.
“I informed [Marshall’s father] that his son could possible be facing the death penalty in the State of Alabama. [Marshall’s father] replied that he loves his son and wish that the events leading up to this point had not taken place, but believes that if he has to pay for his crime with his life, that is what he will have to do. [Marshall’s father] stated that he did not intend to be present at the sentencing hearing for [Marshall,] but asked that he be kept informed of the status of the disposition of the case.
“When asked about the biological mother of [Marshall, Marshall’s father] stated that they had been divorced for many years and that he has lost contact with her, but believes that she is located in the State of Florida. [Marshall’s father] stated that his son was raised by his biological mother and he felt that the mother did not do a sufficient job raising him. He could not provide a name the biological mother might be listed under, and attempts to locate her using the last name Marshall were unsuccessful.
“[Marshall’s father] informed me that he does not even know how to contact the biological brothers and sister of [Marshall] or a step-sister [Marshall] has. He stated that one of his brothers was believed to be home at Fort Bragg, North Carolina from military duty in Iraq. A search of the Fort Bragg post locator was unable to eonñrm any member of the Fort Bragg community as being a relative of [Marshall.]
“[Marshall’s father] did mention that [Marshall] ... appeared to have had some mental stability issues during his childhood which might have contributed to the case involving him in Birmingham. [Marshall’s father] provided me with the name an[d] telephone number of the physician for [Marshall,] which I contacted and requested a copy of the medical records for [Marshall] be sent to your office.
“It is the humble opinion of this agent that [Marshall’s father], nor any member of his family would provide any positive input to a judge or jury that would cause them to see any reason why [Marshall] should receive any relief in this case.”
(C. 1305-06.) Mathis described the letter as follows:
“The gist of the letter is, that I’ve got .this list and I’ve tried to contact .all of these people, I can’t get a hold of anybody. It, appears to me that the ones I did get ahold of, indicated to me that nobody cares about what happens to this man.”.
(R2. 142.) Mathis stated that he never asked fór a copy of the list Marshall provided to Investigator Armour and that he did not do so because, he said, “[a]fter reading the remainder of [Armour’s] letter, I assume, and the fact that the investigator couldn’t' find thesis' people, I just didn’t. I didn’t ask for the list.” ' (R2. 138.) Mathis testified that he did not make any attempts to contact Marshall’s mother, but he recalled speaking to Marshall
“about the fact that his family didn’t want to have anything to do with him. That they knew what was going on and they knew where he was. [He] figured if they didn’t care anymore about their son than to contact his lawyer when he’s charged with capital murder, [he] sure as hell didn’t need to contact them.”
(R2. 130.) Mathis testified, however, that he spoke with Berguitta Marshall, Marshall’s sister, during the trial in an attempt to see if she would provide any assistance *600 to Marshall’s case. According to Mathis, Berguitta
“had no intention of helping us do anything, She thought [Marshall] was getting just what he deserved. She would testify for the State, but she would not testify for'us.”
(R2. 200.) Regarding Investigator Armour’s performance, Mathis testified that he
“fe[lt] like he did an excellent job on this case with what he had to work with. [He] paid attention to what [Investigator Armour] had told [him], and [he] believed [Investigator Armour] was correct in what he said.”
(R2.184.)
Mathis also testified that he retained Dr. Ackerson to assist with the penalty phase of Marshall’s trial. Mathis testified that he had used Dr. Ackerson “[q]uite a few times” in capital-murder cases and that, in those cases, she had found favorable mitigation evidence. Dr. Ackerson, however, provided Mathis with an unfavorable report regarding Marshall. Specifically, Dr. Ackerson’s report, which was admitted at the evidentiary hearing as “Petitioner’s Exhibit 1,” detailed Marshall’s childhood and family history, his adult history, his education/military/employment history, his substance-abuse history, his previous physical/psychiatric treatment, and his previous legal/violent behavior, and concluded:
“On December 15, to January 5, 2005, [Marshall] participated in a mitigation evaluation as requested by defense counsel .... [Marshall] has been charged with Capital Murder.
“[Marshall] was cooperative with the evaluation but he is not believed to have been completely honest in his report and statements. Nonetheless, sufficient collateral data was provided that has allowed for the following opinions to be rendered with a reasonable degree of psychological certainty.
“Based on all the information available and [Marshall’s] • current presentation,,it is my opinion that he has never suffered ■ from a serious mental illness. There also is no indication of a serious mental defect on his part and he opined functioning within the low. average to average range of intelligence. In my opinion his history is remarkable for antisocial behaviors, substance abuse and narcissistic-personality traits. Most critically, [Marshall] also has a significant history of violence against women, including sexual aggression. Such aggression coupled with his narcissism'has clearly resulted in impaired personal relationships. In my opinion [Marshall] has harbored animosity and disdain towards women in part due to his less than ideal relationship with his own mother. Within relationships hé has been domineering, aggressive, and has essentially denigrated the rights and welfare of his p[re]vious female partners.
“In my opinion [Marshall’s] animosity towards women coupled with his narcissism. provides the best explanation for his actions related to the alleged offense. He was not mentally ill at the time in question or suffering from cognitive deficits which could have precluded his ability to understand right from wrong and appreciate the nature and potential consequences of his actions. [Marshall,] in my opinion, was angry with the victim, struck out aggressively and in doing,so caused her death. He then made attempts to conceal his actions and for nearly twenty-four hours lied to officials when searchers were looking for the child.”
(C. 1254-55.) Mathis testified that, although he believed portions of Dr. Acker-son’s report were pertinent for mitigation purposes, he could not use the report because, he said, ■ “the report could not be *601 submitted a piece at a time. It had to be submitted, the whole hog.. The whole hog would have killed us. It would have put him in the. electric chair.” (R2. 131-32.) Mathis further testified that he did not follow up with family members regarding Marshall’s childhood history in Dr. Acker-son’s report because, he said, he believed the report was true and that he “could not, even during the guilt phase when' [Marshall] had a’sister in ... the courtroom, get her to testily.. -.. They would not — the family wouldn’t help. They didn’t have anything for [Marshall]. Nothing. This is what we had.” (R2. 133.) Mathis also stated that he did not follow up with a “medical professional” as to how Marshall’s substance-abuse history could have impacted Marshall because, he said, “Dr. Ackersoni was' -an expert in that field.” (R2.133.)
Having set out Marshall’s trial counsel’s investigatory efforts with regard to mitigation evidence, we now turn to Marshall’s specific claims of ineffective assistance of counsel for failing to adequately investigate and present mitigation evidence during the penalty phase of Marshall’s trial, a.
Marshall contends that his trial counsel were ineffective for relying on Investigator Armour and Dr. Ackerson for discovering possible mitigation- evidence and not.“going beyond” those experts’ reports and opinions by conducting their own independent investigation into possible mitigation evidénce.
As a threshold issue, we note that trial counsel is not ineffective for delegating the responsibility of investigating mitigation evidence to subordinates..
“In Hall v. State, 979 So.2d 125 (Ala.Crim.App.2007), this Court found that Hall was not deprived of the effective assistance of counsel when counsel delegated the responsibility for investigating the. case to a subordinate. We stated:
“ ‘ “[I]t is neither unprofessional nor unreasonable-Tor a lawyer to use surrogates to.investigate and.interview potential witnesses rather than doing so personally. See Harris v. Dugger, 874 F.2d 756, 762 & n. 8 (11th Cir.1989). In fact; we have criticized counsel in other cases for failing to utilize subordinates to conduct pre-trial investigation. See Henderson v. Sargent, 926 F.2d 706, 714 (8th Cir.1991).”
“‘Walls v. Bowersox, 151 F.3d 827, 834 n. 4 (8th Cir.1998). See also Callahan v. State, 24 S.W.3d 483, 486 (Tex.Ct.App.2000) (holding that “[a] defense attorney is not required to investigate the facts of a case personally. Counsel may delegate the investigation to a private .investigator”). Finally, when discussing the duty to investigate mitigating, evidence in Rompilla [v. Beard, 545 U.S. 374 (2005) ], Wiggins [v. Smith, 539 U.S. 510 (2003)], and Williams [v. Taylor, 529 U.S. 362 (2000) ], the Supreme Court did not expressly or impliedly hold that counsel must perform the actual investigation. Therefore, we conclude that the appellant’s trial attorneys did not render ineffective assistance when they relied on subordinates to conduct most of the mitigation investigation, communicated with them during tlje investigation, and made the.ultimate decision about what mitigation evidence to present.’
“979 So.2d at 163. Other courts have noted that it is a reasonable practice for defense counsel in a capital-murder case to -hirp ah investigator.] See, United States v. Weaver, 882 F.2d 1128, 1138 (7th Cir.1989) (‘If defense counsel is unable, to personally complete these tasks, then counsel must seek the aid of others, *602 including experts and investigators, to assist in the preparation and investigation.’); Jones v. United States, (No. 4:11CV00702ERW, November 16, 2011) (E.D.Mo.2011) (not reported in F.Supp.2d) (counsel’s decision ,to rely on the investigator’s file was not unreasonable); Cator v. Warden, (No. CV010810396, February 25, 2004) (Conn.Super.Ct.2004) (not reported in A.2d) (‘There is nothing in the law that mandates an attorney to individually interview all potential witnesses and he or she may rely upon the services of a properly designated assistant, such as an investigator, to do so.’). Cf. Davis v. State, 928 So.2d 1089, 1117 (Fla.2005) (‘Trial counsel is not absolutely required to hire an investigator under all circumstances. Trial counsel is only required to conduct a reasonable investigation.’).
“In fact, the American Bar Association’s Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 ed.) (‘ABA Guidelines’) recognize as appropriate the hiring of an investigator to conduct interviews on‘behalf of appointed counsel. See ABA Guidelines 10.7 & Commentary.”
Washington, 95 So.3d at 40-42.
As set out above, trial counsel retained two experts in an effort to obtain mitigation evidence, trial counsel spoke with the experts; reviewed their reports, determined that family members did not want to participate in the presentation of mitigation evidence, and determined that it would be detrimental to Marshall tó call Dr. Ackerson as a witness during the penalty phase of Marshall’s trial. Thus, like Hall, Marshall’s trial counsel was not ineffective for relying on Dr. Ackerson and Investigator Armour to investigate mitigation evidence.
Additionally, to the extent that Marshall’s argument can be construed as alleging that his trial counsel were ineffective for failing to “go beyond” the reports of Dr. Ackerson and Investigator Armour and conduct further investigation into possible ’ mitigation evidence, that claim is without merit.
Although
“ ‘counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, “this duty only requires a reasonable investigation.” Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a “substantial investigation into each of the plausible -lines of defense.” Strickland, 466 U.S. at 681, 104 S.Ct. at. 2061 (emphasis added). “A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.” Id., 466 U.S. at 686, 104 S.Ct. at 2063.’ ”
Washington, 95 So.3d at 40-41 (quoting Jones v. State, 753 So.2d 1174, 1191 (Ala.Crim.App.1999)) (final emphasis added).
Here, although trial counsel delegated the responsibility of locating mitigation evidence to Investigator Armour and- Dr. Ackerson, trial couflsel’s investigation of possible mitigation evidence was, in this case, reasonable. The testimony adduced at the evidentiary hearing indicated that Marshall provided to Investigator Armour a list of family .members Marshall believed would assist trial-counsel during the penalty phase of his trial: Investigator Armour attempted to contact those family members for purposes of discovery of mitiga *603 tion evidence, but they were either unwilling to assist in Marshall’s defense, did not return telephone •calls, or were unable to be located. Although Mathis testified that he believed that Investigator-Armour’s assessment that the family members would be unwilling to assist during trial was correct, Mathis attempted, during trial, to persuade Marshall’s sister, Berguitta Marshall, to testify on Marshall’s behalf, but— just as Investigator Armour concluded— Berguitta was unwilling to help. Additionally, Mathis testified that he spoke with Marshall about his family’s unwillingness to assist in the proceedings, and no .evidence was presented indicating that Marshall provided trial counsel with any further information about people he wanted trial counsel to contact to assist in his defense. See McWhorter, 142 So.3d at 1257 (“ ‘ “The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.” ’ ”).
Additionally, although Dr. Ackerson’s report contained information that may have been used in mitigation — e.g., information regarding Marshall’s childhood and his history of abuse — trial counsel determined that they could not use Dr. Acker-son’s information as mitigation evidence because “the report-could not be submitted a piece at a time. It had to be submitted, the whole hog. The whole hog would have killed us. It would have put him in the electric chair.” (R2.131-32.)
Thus, Marshall’s trial counsel-were not ineffective; trial counsel’s investigatory efforts in locating mitigation evidence were reasonable.
■ Although Marshall’s Rule 32 counsel argues that Marshall’s -trial counsel should have done more to discover possible mitigation evidence, trial counsel is not required to “discover every shred of evidence.” See Washington, 95 So.3d at 41. Accordingly, the circuit court did not err when it concluded:
“[T]he record establishes that trial counsel. did not provide deficient performance in their investigation of Marshall’s mitigation case. Trial counsel reasonably hired a private" investigator to search for mitigation’ witnesses, but the potential mitigation witnesses who were located refused to cooperate for reasons that are understandable. Trial counsel also hired clinical psychologist Dr. Ack-erson, but she did not find useful mitigation evidence. In his petition, Marshall fails to allege what more reasonable counsel would have done to obtain "mitigation evidence. As such, Marshall’s claim that trial counsel provided deficient performance in contacting mitigation witnesses fails to state a material issue of fact or law. Furthermore, this claim is meritless; accordingly, this claim is dismissed.”
(C. 1013-14.) .
b.
Marshall contends that, although trial counsel retained an investigator and.a clinical psychologist,' his trial counsel were ineffective “for not hiring a neuropsychologist” (Marshall’s brief, p. 54) and for not hiring a “mitigation expert.” (Marshall’s brief, p. 72.)
Marshall first contends that his trial counsel were ineffective for failing to hire a neuropsychologist because, he says, a neuropsychologist “can make medical diagnosis and address the effects of illnesses on a person’s cognitive abilities.” (Marshall’s brief, p; 55.) Specifically, Marshall *604 contends that had trial counsel retained a neuropsychologist the “jury would have learned” of Marshall’s “inconsistent treatment of his thyroid condition,” Marshall’s “severe sleep apnea,” Marshall’s “learning disabilities or ADHD,” and that “severe physical and .mental abuse on Marshall during his formative years, combined with the neglect and abandonment, could have affected his judgment on the day of the murder.” (Marshall’s brief, pp. 56-57.)
Marshall, however, has failed to establish that his trial counsel’s performance was deficient for failing to hire a neuropsy-chologist. As explained above, Marshall hired a clinical psychologist, Dr. Ackerson, ■to assist in gathering mitigation evidence. Dr. Ackerson, however, after extensively interviewing Marshall, provided trial counsel with an unfavorable report, which trial counsel believed was correct and would be detrimental to Marshall. Although Marshall’s Rule 32 counsel later located a neu-ropsychologist' who would provide favorable information for Marshall, '
“ ‘the mere fact a defendant can find, years after the fact, a[n] ... expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial. See, e.g., Horsley v. Alabama, 45 F.3d 1486, 1495 (11th Cir.1995) (“That experts were found who would testify favorably years later is irrelevant.”); Elledge v. Dugger, 823 F.2d 1439 (11th Cir.1987).’ ”
Daniel, 86 So.3d at 423 (quoting Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir.1997)).
Moreover, although Marshall contends that his trial counsel should have retained a neuropsychologist and explains what testimony a neuropsychologist could have provided, Marshall does not explain how he was prejudiced by his trial counsel’s failure to hire a neuropsychologist. Marshall, instead, makes a conclusory allegation that “[t]he failure To get this mitigation evidence to the jury was ineffective.” (Marshall’s brief, p. 58¡) Marshall’s con-clusory allegation is insufficient, to satisfy his burden of demonstrating that he has satisfied the prejudice component of Strickland.
Marshall also argues that trial counsel were ineffective because trial counsel failed to hire a mitigation expert, which, he says, would have “better contextualized Marshall at the mitigation phase, instead of simply relying on jurors’ compassion.” (Marshall’s 'brief, p. 73.) Specifically, Marshall contends that his trial counsel should have retained “Jan Vogelsang, a licensed clinical social worker,” who would have testified as follows:
“The accumulation of events in [Marshall’s] childhood left him as an adult with a pattern of problems in relationships. The intergenerational family history reveals a pattern of unusual sexual relationships and molestation. Bom to parents who literally swapped spouses, [Marshall’s] childhood and adolescence were spent witnessing violent and aggressive acts between his mother and male figures none of whom modeled healthy or nurturing behavior. Abandoned first by his father and later by his mother, [Marshall] developed into an adult who wanted a family but didn’t know how to choose the right person, develop the relationship, maintain it using skills learned during developmental stages, and survive the rejection if and when the relationship fails.
“It is my opinion that this accumulation of overwhelming life events placed [Marshall] at high risk to act out behaviorally and without long-term intervention, to deteriorate in his behavior and his ability to function. This accumulation left [Marshall] with poor judgment, poor insight and an inability to handle *605 rejection wherein he would resort to sex, intimidation and aggression all of which he either witnessed or learned from the adults in his life.”[8] .
(Marshall’s brief, pp. 73-74.) . Marshall contends that Vogelsang’s testimony “is significant because it gives context and meaning to the testimony of the lay witnesses that will testify on behalf of Marshall.” (Marshall’s brief, p. 74.)
This Court has held, however, that
“‘[hjiring a mitigation specialist in a capital case is not a. requirement of effective assistance of counsel.’- Phillips v. Bradshaw, 607 F.3d [199] at 207-08 [ (6th Cir.2010) ].
‘“[The petitioner] claims “inadequate preparation and presentation of mitigation evidence,” because counsel should have hired a “mitigation specialist” to gather mitigating evidence. However, he cites no authority that this is a requirement of effective assistance, and we hold that it is not.’
“State v. McGuire, 80 Ohio St.3d 390, 399, 686 N.E.2d 1112, 1120 (1997). See also Jonathan P. Tomes, Damned If You Do, Damned If You Don’t: The Use of Mitigation Experts in Death Penalty Litigation, 24 Am. J.Crim. L. 359 (1997) (“Whether a court casts its grounds for failing to find a constitutional violation of the right to counsel for failure to hire or use a mitigation expert, in terms of the defendant’s failure to meet either or both of the Strickland prongs, as a reasonable tactical decision, or as a procedural matter, the result is the same— affirmance of the death penalty in all but the very few cases in. which counsel’s performance is so deficient that the de- . fendant can satisfy the high hurdle of Strickland and its progeny.’).”
Daniel v. State, 86 So.3d at 437.
Here, trial counsel did not hire a “mitigation expert” to assist in investigating and presenting mitigation evidence. Trial counsel instead retained both a private investigator and a clinical psychologist to assist in the mitigation phase of Marshall’s trial — which was a reasonable decision. Simply because trial counsel did not retain the same type of expert to assist in the mitigation phase that Rule 32 counsel would'have retained does'not render Marshall’s trial counsel ineffective!
Accordingly, the circuit court did not err when it denied these claims.
C.
Marshall contends that his trial counsel was ineffective for failing to “present' to the jury and sentencing judge a wealth of readily available and compelling mitigation evidence.” (Marshall’s brief, p; 61.) Specifically, Marshall contends that his trial counsel failed to present evidence “of the physical and emotional abuse Marshall suffered as a result of extreme violence, alcohol abuse and abandonment in his family” (Marshall’s brief, p. 62) and that Marshall “endured an ever changing living environment, but showed promise in structured environments.” (Marshall’s brief, p. 67.) Marshall’s claims, however, are without merit.
Marshall,, at the Rule 32 evidentiary hearing, presented the testimony of several . of his family members, including Charles Wilkins, Berguitta Marshall, Beverly Charlton, Barbara Charlton, and Cleo Brasted, as well as Louise Hostetler — the *606 former director of Braddock House, a “ ‘state facility for children who were designated as [a] ... [ ]“Child In Need of Services’! ] ... or juvenile delinquents’ ” (Marshall’s brief, p. 68) (quoting Supplemental Record on Appeal, C. 107) — and Reverend Gerald Scott and Marlene Scott. This testimony was presented to the circuit court either at the hearing, in the form of a deposition transcript,, or by sworn affidavit.
The testimony of Marshall’s family members detailed Marshall’s childhood abuse. Specifically, that testimony indicated that Marshall’s “father figure” was his stepfather, Dean Johnson, and that Johnson was a “heavy drinker”-and violent. Marshall, as well as his other family members, witnessed Johnson’s violent behavior on a weekly basis and were themselves victims of Johnson’s violent behavior. The testimony also demonstrated that Marshall suffered abuse from his mother’s .other partner, Jerry A|res. Additionally, the testimony from Marshall’s family members demonstrated that Marshall had lived in numerous locations while he was growing up.
Louise Hostetler, the former director of Braddock House, testified by sworn affidavit. (Supplemental Record on Appeal, G. 106-09.) According to Hostetler’s affidavit:
“While Marshall was living at Braddock House he did not exhibit any really bad behavior. In fact, there was one incident when another child was going to run away from Braddock House', and Marshall stepped in and counseled him to stay. Marshall told the boy to settle down and to think before he ran away and got into more trouble.”
(Supplemental Record on Appeal, C. 107.) Additionally, Reverend Scott testified that Marshall lived with him and his wife, in a “group home” in .1982 after Marshall left the Braddock House. Reverend Scott testified that they had no difficulties -with Marshall and had not seen any violent tendencies in Marshall.
As set out above, Marshall contends that his trial counsel were ineffective for failing to present this mitigation evidence because, he says, it demonstrated the “physical and emotional abuse and domestic violence that pervaded Marshall’s life history” and that Marshall “showed promise in a structured environment.” Even assuming that Marshall’s trial counsel were deficient for- failing to present this mitigation evidence, Marshall failed to demonstrate that he was prejudiced by trial counsel’s failure to present this mitigation evidence.
Here, the same judge who presided over Marshall’s capital-murder trial also considered his postconviction petition. In the postcónvictíon proceedings, the circuit court found in' its order denying Marshall relief that
' “Marshall"failed to establish prejudice because the aggravating circumstances outweighed the mitigation evidence presented at the Rule 32 evidentiary hearing. Marshall presented the testimony of several witnesses: Charles Allan Wilkins, Berguitta Marshall, Beverly Charl-ton,' Barbara Charlton, Cleo Brasted, Gerald Scott, and Marlene Scott. Those witnesses testified to instances of childhood abuse and other hardships that Marshall endured as a youth. However, mitigation evidence emphasizing physical abuse, neglect, and poverty, would have highlighted that Berguitta Marshall, Marshall’s sister, and Charles Wilkins, his brother, grew up in the same environment and emerged as successful, law abiding citizens. See Callahan v. Campbell, 427 F.3d 897, 937 (11th Cir.2005) (social worker conceded that none of Callahan’s siblings had committed vio-., lent crimes ‘further reducing the value of abuse as mitigating evidence’); see *607 also, Grayson v. Thompson, 257 F.3d 1194, 1227 (11th Cir.2001) (‘The fact that Grayson was the only child to commit such a heinous crime also may have undermined defense efforts to use his childhood in mitigation.’). Furthermore, because 'Marshall was 40-years-old when he committed the murder, the impact of childhood evidence would have been minimal.”
(C. 1014-15.) We afford the experienced judge’s ruling “considerable weight.” See State v. Gamble, 63 So.3d 707, 721 (Ala.Crim.App.2010); and Washington v. State, 95 So.3d 26, 53 (Ala.Crim.App.2012).
Moreover, we have conducted our own de novo review and have reweighed the alleged omitted mitigation evidence against the evidence that was presented at Marshall’s trial and sentencing hearing. See Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The trial court found the existence of three aggravating circumstances: (1) that the capital offense was committed while Marshall was under sentence of imprisonment; (2) that Marshall had previously been convicted of a felony involving the use or threat of violence to the person; and (3) that Marshall was engaged in the commission of a burglary at the time the capital offense, was committed. Additionally, the trial court found that no statutory mitigating circumstances existed and that there were no nonstatutory mitigating circumstances. The evidence presented at Marshall’s Rule 32 evidentiary hearing was to a great extent centered around Marshall’s abusive childhood and transient lifestyle and was entitled to little weight. Thus, we agree with the circuit court that the admission of this evidence would not have changed the verdict in the penalty phase.[9]
Accordingly, Marshall has failed to establish that he was prejudiced by the alleged omission of the above mitigating evidence. Thus, Marshall has failed to satisfy the Strickland test, and the circuit court correctly denied this claim.
II.
■ Marshall contends that juror M.J., juror T.C., and juror W.P. failed to truthfully answer questions propounded to them during voir dire and, further, argues that juror M.J. introduced “extraneous information” during the jury-deliberation process.[10]
A. Juror Misconduct — Voir Dire
This' Court has articulated the following in reviewing juror-misconduct claims arising from a juror’s failure to truthfully answer questions during voir dire:
“Tn [Ex parte] Dobyne, [805 So.2d 763 (Ala.2001),] this Court explained the standard for granting a new trial based on a juror’s failure to answer questions on voir dire truthfully: .
““‘The proper standard for determining whether juror misconduct warrants a new trial,1 as set out by this Court’s precedent, is' whether the misconduct, might have prejudiced, riot whether it actually did prejudice, the' defendant. See Ex parte Stewart, 659 So.2d 122 (Ala.1993).... The ‘might-have-been-prejudiced’ standard, of course, casts a ‘lighter’ burden on the defendant than .the actual-prejudice standard. See Tomlin y. State, su *608 pra, 695 So.2d [157,] 170 [ (Ala.Crim.App.1996) ] —
“ ‘ “It is. trae that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely.... However, not every failure to respond properly to questions propounded during voir dire ‘automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.’ Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330, 335 (1970) _As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is ‘whether the defendant might have been prejudiced by a veniremember’s failure to make a proper response.’ Ex parte Stewart, 659 So.2d at 124. Further, the. determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a- matter within the trial court’s discretion. ... ■ ■
“ ‘ “ ‘The determination of whether the complaining party was-prejudiced by a juror’s failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: “temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror’s inadvei’-tence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.” ’ “ ‘ “Union Mortgage Co. v. Barlow, 595 So.2d [1335] at 1342-43 [ (Ala.1992)]....
“‘“The form of prejudice that would entitle a party to relief for a juror’s nondisclosure or falsification in voir dire would be. its effect, if any, to cause the party to forgo challenging the juror for, cause or exercising a peremptory challenge to. strike the juror. Ex parte Ledbetter, 404 So.2d 731 (Ala.1981).... If the party establishes that the juror’s disclosure of the truth would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory , challenge to strike the juror, then the party has made a prima facie showing of prejudice. Id. Such prejudice can be established by the obvious tendency of the true facts to bias the juror, as in Ledbetter, supra, or by direct testimony of trial counsel that the true facts would have prompted a challenge against the juror, as in State v. Freeman, 605 So.2d 1258 (Ala.Crim.App.1992).”
“ ‘Dobyne, 805 So.2d at 771-73 (footnote omitted ...).’
“Dixon [v. State, 55 So.3d 1257, 1260-61 (Ala.2010) ].
“■‘While we agree ... that a juror’s silence during voir dire could be a basis -for granting a new trial, we must stress that the initial decision on this issue is within the trial court’s sound discretion. Hayes v. Boykin, 271 Ala. 588, 126 So.2d 91 (1960). Further, the trial court’s decision-on this matter will not be disturbed on appeal unless the appellant establishes that the decision was arbitrarily entered into or was clearly erroneous. Id.’
“Carter v. Henderson, 598 So.2d 1350, 1354 (Ala.1992). ‘[N]ot every failure of a venirqman to respond correctly to a voir -dire question will entitle the losing *609 party to a new trial.’ Wallace v. Campbell, 475 So.2d 521, 522 (Ala.1985).
“ ‘It is not “any failure of any prospective juror to respond properly to any question regardless of the excuse or circumstances [that] automatically entitles a party to new trial or reversal of the cause on appeal.” Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330 (1970) (emphasis in original).’
“Washington v. State, 539 So.2d 1089, 1095 (Ala.Crim.App.1988). ‘[T]he facts in each case must be considered individually arid much will remain in the discretion of the trial judge.’ Parish v. State, 480 So.2d 29, 32 (Ala.Crim.App.1985).”
McWhorter v. State, 142 So.3d 1195, 1212 (Ala.Crim.App.2011) (quoting Albarran v. State, 96 So.3d 131, 194-95 (Ala.Crim.App.2011)).
Here, Marshall contends that juror M.J., juror T.C., and juror WP. failed to truthfully answer question's propounded to them during voir dire. Specifically, Marshall alleged, in his Rule 32 petition, that
“[t]hese failures include, without limitation, the failure to respond truthfully and/or fully to questions about beliefs that a defendant who is convicted of capital murder should always' be given the death penalty; pre-trial knowledge of the cáse gained from the media or otherwise; belief of a police officer over a lay witness; prior experience on a criminal jury; the potential juror’s history as the victim of a violent crime or his/her knowledge of someone’s history as the victim of a violent crime; having teenagers, adult children, and nieces and nephews;. being able to. render a fair and impartial verdict; ■ knowing counsel, the ■ defendant, the victim’s mother; the victim, and/or.the Court staff and personnel; bias or prejudice that would influence the verdict; prior .experience in or knowledge of people with experience in law enforcement work; ability to convict only if there, proof of guilt beyond a reasonable doubt; willingness not to convict if there is a reasonable doubt; influence by the beliefs and opinions of others about the case; and/or pressing personal or business reasons not to desire to serve as a juror.” [11]
(C, 121-22.) We. address each alleged instance of juror misconduct in turn.
1.. Juror M.J.
• Marshall, in his second amended Rule :32 petition, alleged that juror M.J. failed to truthfully answer :the following questions:
“ ‘Do any of you have a bias or prejudice that would influence your verdict in this manner in any way?
“ ‘Do any of you have any reason why you could not give: both the State of Alabama and the defendant, William Bruce Marshall, a-fair and impartial trial? ' ■ ■ '
. “ ‘If anyone has been the victim of a violent crime .... Anyone a victim?
[[Image here]]
' “ ‘Is there anyone here who feels like ’for whatever reason, and I won’t ask you, you won’t be able to render a fair and impartial verdict in this case? You won’t be able to sit as a fair and impartial juror?'
*610 “ ‘Do you feel you might require less proof than a case which did not involve violence?’ ”
(C. 582-83 (quoting portions of the record on direct appeal; citations omitted).)
Marshall argued that juror M.J. should have responded to these questions because, he said, juror M.J. “suffered a physically and emotionally abusive first marriage for four years, involving at least one instance of having a firearm discharged at her.” (C. 580-81.) Marshall also alleged that he struck a potential juror who had also been the victim of spousal abuse and who indicated that she did not believe that she could be fair and impartial.
At the evidentiary hearing, juror M.J. testified that her first husband, whom she married in 1968, had “a problem with substance abuse, primarily alcohol,” and that, “[a]s the alcohol use increased, the verbal abuse increased.” (R2. 21-22.) According to juror M.J., after some marriage counseling, “the abuse went from verbal abuse to physical abuse,” and one “night [she] woke up with him standing over the bed with his hands around [her] neck.” (R2. 22.) Juror M.J. testified that the abuse had a “serious effect” on her and that she thinks about it “now-and-then.” Juror M.J. stated that in December 1971 she divorced her first husband and “went on to meet a nice man who suited [her] and with whom [she has] been married for 37 years.” (R2. 23.)
Juror M.J. testified that she remembered being asked the above-listed questions and that she did not respond to them. With regard to the question about being the victim of a crime, juror M.J. explained that when she “thought of a crime[, she] thought of being burglarized, or having something stolen from [her] car. [She] just didn’t equate the term ‘crime’ with the domestic situation.” (R2. 30-31.) Juror M.J. further stated that she believed that the “closest” thing to a crime involving her first husband was when she believed that he had discharged a firearm after an altercation with her. Juror M.J. explained that she did not answer the question because she did not believe that her first husband had committed a crime. Juror M.J. further explained that if an attorney had asked “if [she] had been in an abusive relationship, [she] certainly would have said yes.” (R2. 33.)
On cross-examination, juror M.J. testified that she did not have any bias against Marshall and that she had made her decision based on the facts and the evidence that she heard at trial.
Although juror M.J. failed to respond to the above-listed questions, the matter inquired about during voir dire — i.e., whether juror M.J. was a victim of a crime— occurred approximately 35 years before Marshall’s trial; juror M.J. did not consider what happened to her to, in fact, be a crime; and juror M.J. stated that had she been asked whether she had been subject to spousal abuse she would have responded to the question.[12] In other words, the matter inquired about was remote, the question propounded was, in juror M.J.’s mind, ambiguous, and juror M.J. did not willfully fail to answer the question. See McWhorter, supra.
Because the evidence presented at the evidentiary hearing established that juror M.J. did not commit misconduct when she did not respond to the question about being the victim of a crime, the circuit court did not abuse its discretion when it denied Marshall’s claim, finding:
“Marshall alleges that [juror M.J.] committed misconduct by failing to re *611 veal that she was the victim of a violent crime and by failing to respond to questions related to general bias. Marshall presented evidence that [juror M.J.] endured emotional and physical abuse from her first husband. (EH. 21-27, 31-32.) At the evidentiary hearing, [juror M.J.] was clear that she did not respond to the question asking whether anyone had been the victim of a violent crime because she did not consider the abuse she had experienced to be criminal. Her husband had not been arrested or convicted of any crime in connection with the abuse. (EH. 46-47.) [Juror M.J.]’s testimony furthermore established that she held no bias against Marshall and that she based her decisions as a juror on the facts the -law presented at trial and not on her personal experience with her first husband. (EH. 46-50.) Thus, Marshall failed to prove either that [juror M.J.] committed misconduct or that the alleged misconduct ‘might have prejudiced’ him.”
(C. 1033-34.)
2. Juror T.C.
Marshall, in his second amended Rule 32 petition, alleged that juror T.C. failed to truthfully answer the following questions:
“ ‘Do any of you have a bias or prejudice that would influence your verdict in this manner in any way?
“ ‘Do any of you have any reason why you could not give both the State of Alabama and the defendant, William Bruce Marshall, a fair' and impartial trial?
[[Image here]]
“ ‘How many people have children?
“ ‘Is there anyone here who feels like for whatevér reason, and I won’t ask you, you won’t be able to render a fair and impartial verdict in this case? You won’t be able to sit as a fair and impartial juror?’ ”
(C. 582-83 (quoting portions of the record on direct appeal; citations'omitted).)
Specifically, Marshall argued, in his Rule 32 petition, that,
“during voir dire, one of the-questions asked was: ‘How many'people have children?’ Post-conviction investigation has revealed, and the evidence will show, that Juror T.C. and' his wife are foster parents for a State of Alabama program involving children in sex abuse cases. Juror T.C. failed to disclose this fact. Considering this case, involved allegations of sexual abuse of a minor child, it is more likely than not that Mr. Marshall’s trial counsel would have struck Juror T.C. for cause.”
(C. 581-82 (citation omitted).)
At. the evidentiary hearing, juror T.C. testified that in January 2006 .he served as a juror during Marshall’s trial. Juror T.C. testified that he ; and .his wife have an adopted son and that he is also a certified foster parent “for what’s called Specialized Therapeutic Foster Care,” which, he explained, .
“is for boys ... ..ages six.to twelve, that are what [the Department of Human Resources] characterizes them as predatory sexual offenders,, meaning that these boys have either been sexually abused or have abused another child.”
(R2. 60.). Juror T.C. testified that he and his wife received their first foster -child in 2007. Juror T.C. testified that, at the time of trial, he and his wife had never had any foster children in their home, but, he said, they had looked into foster care “on and off’ from 2002 to 2005. . Juror T.C. stated that .before serving as a juror in Marshall’s trial, he and his wife had completed a “ten-week .training, session” and had become certified to receive a foster child in December 2005.
■ Juror T.C. testified that he recalled the voir dire questions and that he “raised *612 [his] hand and said that [he] was aware of the case. Not the complete details, and the area, also.” . (R2. 70.) Juror T.C, further testified that he only recalled the parties mentioning that it was a “murder case, that’s about the specifics of it that [he could] recall.” (R2. 70-71.) Juror T.C. testified that he recalled being asked the above-listed questions, that he understood the questions, that the questions were not ambiguous, and that he did not respond to the. questions because, he said, he “didn’t see any connection with those questions .... and [his] experience with the foster care program.” (R2. 73.)
On cross-examination, juror T.C. testified that he based his decision in both the guilt phase and penalty phase of trial on the evidence presented and the instructions given by the trial court. Juror T.C. also testified that he did not have any bias against Marshall; specifically, juror T.C. stated that he “did not know Mr. Marshall before this, or did not have anything against him.” ! (R2. 85.)
Although juror T.C. failed to respond to the question inquiring about whether potential jurors had children, at’ the time of trial jüror T.C. had no children living in his home. That question, therefore, did not apply to him, and he did not engage in misconduct when he did not respond. Additionally, with regard to the questions asked about general bias, juror T.C. testified that he did not believe-that his participation in foster-care -classes had any connection with the above-listed questions. Thus, juror T.C. did. not willfully fail to answer the above-listed questions. See McWhorter, supra.
Because the evidence presented at the evidentiary hearing established that juror T.C. did not commit juror misconduct, the circuit court did not abuse its- discretion when it denied Marshall’s claim, finding:
“Marshall alleges that [juror T.C.] committed misconduct by failing to respond to questions related to general bias despite his prior involvement with a State of Alabama program for sexually abused children. [Juror T.C.] testified that he saw ‘no connection with those questions and [his] experience with the Foster Care Program.’ (EH. 74.) [Juror T.C.] furthermore testified that he held no bias against Marshall and that he based his decisions as a juror on the facts presented at the trial. (EH. 84-85.) Thus, Marshall failed to prove either that [juror T.C.] committed misconduct or that the alleged misconduct ‘might have prejudiced’ him.”
(C. 1034-35.)
3. Juror W.P.
Marshall, in his second amended Rule 32 petition, alleged that juror W.P. failed to truthfully answer the following questions:'
“ ‘Do any of you have any reason why you could not give both the - State of Alabama and the defendant, William Bruce Marshall, a fair and impartial trial?
[[Image here]]
“ ‘Is there anyone here who feels like for whatever reason, and I won’t ask you, you won’t be able to render a fair and impartial verdict in’ this case? You won’t be able to sit ás a fair and impartial juror?’ ”
(C. ,583 (quoting portions of the record on direct appeal; citations omitted).)
Specifically, Marshall alleged that juror W.P. should have answered these questions because, he said, “[p]ost-eonviction investigation ha,s revealed, and the evidence will show, that Juror W.P. had severe eyesight/vision problems during the trial, which he failed .to disclose during voir dire questioning. The evidence will show that during the trial Juror- W.P. could not *613 see-the evidence clearly, but that he never told anyone.” (C. 582.)
At the evidentiary hearing, juror W.P. testified that he served as a juror during Marshall’s trial and that, at the time of the trial, he was “on the borderline of being legally blind.” (R2. 93.) Juror W.P. stated that during the trial he “couldn’t see people in the [witness] box good, the facial expressions. [He] couldn’t see the slides good, or the film.” (R2. 97.) Juror W.P. stated that, at the, time of Marshall’s trial, he used a magnifying glass to, read but that he did not bring his magnifying glass with him to court because, he said, he was “embarrassed.” (R2. 97.)
. Juror W.P. stated that he remembered hearing, the above-listed questions being asked during voir dire and that the questions were not ambiguous, that he understood the questions being asked, and that he was aware of his vision problems. Juror W.P. testified, however, that he “just didn’t think that was a big problem. [He] didn’t think nothing about it.” (R2. 103.)
- On cross-examination, juror W.P. agreed that his decision in both the guilt phase and the penalty phase of Marshall’s trial was based “on the facts and the evidence and the law that the judge explained.” (R2. 107.) Juror W.P. stated that his, vision problems did not “cause him to be biased against. [Marshall] in any way.” (R2. 107.) In fact, juror W.P. testified that “[t]he guilty part was not in question.... the sentencing was what [he] was concerned about.” (R2. 107.) Juror W.P. testified that he “voted to give [Marshall] life.” (R2.107.)
Juror W.P. also testified' that he had the opportunity to view the evidence .more closely during jury deliberation, but he conceded that he could not see the exhibits well.
Although juror W.P. failed to respond to the above-listed questions, juror W.P. did not willfully fail to answer the questions. See McWhorter, supra. In fact, juror W.P. .testified that if someone had asked whether he had a “physical disability or infirmity which would affect [his] review of the evidence” he would have informed the parties about his vision. Thus, the evidence presented at the evidentiary hearing established that juror W.P. did not “willfully” fail to respond to the above-listed questions; instead, juror W;P. simply believed that he could serve as a juror and that'his vision was not a “big problem.” (R2. 103.) Thus, juror W.P. did not engage in juror misconduct.
Additionally, the testimony at the evi-dentiary hearing established that, even if juror W.P. had responded to the questions and informed, the parties about his vision problems, he would not have been removed from .the jury.- Mathis,. Marshall’s trial counsel, testified that if he knew a potential juror had a vision problem he “would leave them on”- the jury because, he said,
“most of the evidence is going to be coming from the State. Hell, if the juror can’t see it, he can’t use it against [Marshall]. Leave them on there. I’d like for them to-be deaf, too.”
(R. 187.) Thus, Marshall suffered no prejudice from juror W.P.’s failure to answer the above-listed questions.
, Accordingly, the circuit, court did not err when it denied this claim, finding:
“[Juror W.P.] testified that he based, his decision as a juror on the facts and law presented at the trial. (EH. 106-07.) [Juror W.P.] furthermore testified that he thought that his poor vision had no affect on his ability to serve as a juror during the- guilt. phase, but that he could not see the slide, presentation during the penalty, phase. (EH. 107-09.) However, copies, of those photographs were sent to the jury room where deliberations occurred. [Juror W.P.] viewed them there. (EH. 109.) Also, [juror *614 W.P.] was the only juror who voted for a sentence of life in prison without parole. (EH; 107.) Furthermore, Mathis testified that he would not have struck [jurbr W.P.] due to his poor vision ‘because most of the evidence is going to be coming from the State. Hell, if the juror can’t see it, he can’t use it against [the defendant]. Leave them on [the jury], I’d like them to be deaf,- too.’ ,(EH. 187.) Thus, Marshall failed to prove either that [juror W.P.] committed misconduct or that the alleged misconduct ‘might have prejudiced’ him.”
(C. 1035-36.)
B. Juror Misconduct—
. ■ Jury Deliberation
Marshall contends that juror M.J. engaged in juror misconduct when she introduced “extraneous information” during the jury deliberation; specifically, Marshall alleges that juror M.J., during guilt-phase deliberation, stated that Alicia’s “vaginal tear could not have been caused by female masturbation.” (Marshall’s brief, p. 121.)
“ ‘Generally, under Alabama law, juror misconduct involving the introduction of extraneous materials warrants a new trial when one of two requirements is met; 1) the jury verdict is shown to have been actually prejudiced by the extraneous material; or 2) the' extraneous material is of such a nature as to constitute prejudice as a matter of law. Knight v. State, 710 So.2d 511, 517 (Ala.Crim.App.1997).’ ”
Taite v. State, 48 So.3d 1, 8 (Ala.Crim.App.2009) (quoting Ex parte Apicella, 809 So.2d 865, 870 (Ala.2001)).
“ ‘Extraneous facts introduced in jury deliberations'can result in actual prejudice or in prejudice as a matter of law, also called presumed prejudice.’ Ex parte Arthur, 835 So.2d 981, 983 (Ala.2002). The Alabama Supreme Court in Ex parte Apicella discussed the differences between presumed prejudice ■ and actual prejudice:
“ ‘Apicella also argues that we should hold the extraneous material introduced through S.B.’s conversation with T.R. to be prejudicial as a matter of law. Apicella supports this argument with the following language from Knight [v. State], 710 So.2d [511,] 517 [ (Ala.Crim.App.1997) ]:
“ ‘ “ ‘Juror misconduct will justify a new trial .,. when from the extraneous facts prejudice may be presumed as a matter of law.’ Whitten v. Allstate Ins. Co., 447 So.2d 655, 658 (Ala.1984).... However, in some cases, ‘the character and nature of the extraneous material [constitute] prejudice as a matter of law and no showing that the jury was in fact influenced thereby in arriving at their verdict is necessary.’ Id. (prejudice presumed as a matter of law from jury’s consulting encyclopedia and dictionary definitions...).”
“‘(Quoting Minshew v. State, 594 So.2d 703, 716 (Ala.Crim.App.1991).)
“ ‘On the other hand, we have also held that “mere exposure to [a] definition does, not require a new trial as a matter of law.” Pearson v. Fomby, 688 So.2d 239, 245 (Ala.1997). Our holding in Pearson serves to emphasize the limitations of the doctrine of “prejudice as a matter of law.”
“ ‘Generally, a presumption of prejudice applies only in a ease in which the jury’s consideration of the extraneous material was “ ‘crucial in resolving a key material issue in the case.” ’ Dawson v. State, 710 So.2d 472, 475 (Ala.1997) (citing Hallmark v. Allison, 451 So.2d 270, 271 (Ala.1984), and Ex *615 parte Thomas, 666 So.2d 855 (Ala.1995)).’ ”
Taite, 48 So.3d at 9.
As stated above, Marshall contends that juror M.J. introduced “extraneous information” during jury deliberation; specifically, Marshall alleges that juror M.J., during guilt-phase deliberation, stated that Alicia’s “vaginal tear could not have been caused by female masturbation.” (Marshall’s brief, p. 121.)
During the evidentiary hearing, juror M.J. explained that “the vaginal tear was probably a key part of the evidence.” (R2. 36.) Thereafter, the following exchange occurred:
“(Outside presence of witness.)
“[The State]: Your Honor, I think I know where he’s going here with this. He’s going to claim that one of the other jurors asked a question abou1> — judging from my conversations with the witness earlier, he’s going to ask whether a male juror asked whether the vaginal tear could have come during masturbation; and that she and another witness indicated that they didn’t think so. He’s going to argue that’s extraneous evidence. That’s not extraneous evidence. I would point Your Honor to [Bethea v.] Springhill [Memorial Hospital, 833 So.2d 1 (Ala.2002) ]. It’s a case involving this very issue, whether a juror’s own knowledge brought into the courtroom, or — into the jury room is extraneous. It is not. It is quité clearly not, including medical knowledge. But they, the Supreme Court, said that a juror’s knowledge about the use of Pitocin, or something, and induced labor was not extraneous.
[[Image here]]
“But the Supreme Court made it quite clear that that sort of knowledge brought into the courtroom was the juror’s knowledge and it was not extraneous, and testimony regarding that would be excluded, or should be excluded.
“[Marshall’s Rule’ 32 Counsel]: Your Honor, if I may respond. I havé read that.'' I’ve got it right here. I am aware of that case and the — sure. I mean, it’s something worth bringing up.
“This is what I’m going to ask her and what I expect her to testify. She is going to testify that someone asked in the jury — -during the jury deliberations, whether a vaginal tear could be caused by masturbation. And, sure, maybe, without embarrassing us all, maybe that is life experience, or whatever. But there was testimony, as I recall, in . the record about the source of the vaginal tear.
“There was no testimony in the record about whether it could or could not have been caused by masturbation. That is a medical opinion. Your Honor, about the source of how a vaginal tear could happen.
[[Image here]]
“THE COURT: [Marshall’s Rule 32 counsel], I’m going to have to disagree with you on this. Let’s face it, and I will say this for the folks in Montgomery that are going to read this. You know, this is all a very stilted thing. The real central issue, let’s face it, to this whole testimony is whether or not she was a fair juror. You know, whether or not she brought her life experiences back there to the jury room. But, yet, the law really forbids us from going into what exactly happened, or what those 12 jurors discussed.
“On the other hand, I tell the jury in my charge, you take your life experiences back there and you discuss them.
“Now, [Marshall’s Rule 32 counsel], you know, we can argue for days with doctors and nurses and lay people about whether or not a- conversation among *616 the 12 jurors as to a vaginal tear and how it could have gotten there, other than, as the State alleged during the trial, forcible, sexual contact.
“But I would have to agree with these lawyers. I don’t see that as extraneous in the sense of somebody going out and looking in a medical book and bringing it back.
“[Marshall’s Rule 32 Counsel]: Or calling your doctor friend. ' '
“THE COURT: Exactly. If you had testimony of that, that’s different. But if they’re just back there talking—
[[Image here]]
“ — and that comes tip, and women were asked, or whatever. You know, I tried 20 years worth of sexual assault cases as a prosecutor and talked to jurors after the fact, and those kind of things do come up. I disagree with you and I will sustain your objection.”'
(R2. 38-42.) Thereafter, Marshall continued questioning juror M.J. about issues other than the alleged “extraneous information” discussed during jury deliberation.
Although Marshall, in- his brief on appeal, recognizes that juror M.J. “was prevented from testifying more about the vaginal tear due to the [circuit] court’s ruling,” Marshall does not specifically argue that the circuit court erred when, under Rule 606(b), Ala. R. Evid., it excluded juror M.J.’s testimony regarding statements juror M.J. allegedly made during deliberation. Marshall, instead, argues only that juror M.J. did, in fact, introduce extraneous. information during jury deliberation, which, he says, prejudiced him. Because the circuit court excluded juror M.J,.’s testimony regarding the discussions she may have engaged in during jury deliberation and Marshall made no offer of proof at the evidentiary hearing, this Court cannot review the merits of Marshall’s claim and, therefore, cannot reverse the circuit court’s judgment as to this claim.
Moreover, even if we construed Marshall’s argument on appeal as chah lenging the circuit court’s decision to exclude juror M.J.’s testimony under Rule 606(b), Ala. R. -Evid., that claim ,is without merit.[13]
In Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002), the Alabama Supreme Court explained:
“Rule 606(b), Ala. R. Evid., provides, in pertinent part:
“ ‘[A] juror may not testify in impeachment of the verdict ..; as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon that or any other juror’s mind or emotions as influencing the juror to assent to or dissent from the'verdict or indictment or concerning the juror’s mental processes in connection therewith,* except that a juror may testify on the question iuhether extraneous prejudicial information ms improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror. ’
“(Emphasis added.) With regard to the ‘extraneous prejudicial information’ exception in Rule 606(b), we have recently noted that ‘“[t]he courts of this state have generally limited the scope of this exception to . the visitation of a crime scene by a juror, the introduction of the definition of legal terms in the jury room, and [the reading of] concepts from general reference books.” ’ Lance, Inc. v. Ramanauskas, 731 So.2d 1204, 1214 (Ala.1999) (quoting with approval the tri *617 al court’s order, which cited Jordan v. Brantley, 589 So.2d 680 (Ala.1991); Nichols v. Seaboard Coastline Ry., 841 So.2d 671 (Ala.1976); and Dawson v. State, 710 So.2d 467 (Ala.Crim.App.1996)).
• “Even more recently, in Sharrief v. Gerlach, 798 So.2d 646 (Ala.2001), we held that affidavits containing ‘accounts of some jurors’ discussions during deliberations’ did not fall under the extraneous-information exception, because the alleged information did not come to the jury from some external authority or through some ‘process outside the scope of the trial’:
“ ‘The plaintiffs misconceive the distinction, under Alabama law, between “extraneous facts,” the consideration of which by a jury or jurors may be sufficient to impeach a verdict, and the “debates and discussions of the jury,” which are protected from inquiry. This Court’s cases provide examples of extraneous facts. This Court has determined that it is impermissible for jurors to define terms, particularly legal terms, by using a dictionary or encyclopedia. See Fulton v. Callahan, 621 So.2d 1235 (Ala.1993); Pearson v. Fomby, 688 So.2d 239 (Ala.1997). Another example of juror misconduct leading to the introduction of extraneous facts sufficient to .impeach a jury verdict is an unauthorized visit by jurors to the scene of an' automobile accident, Whitten v. Allstate Ins. Co., 447 So.2d 655 (Ala.1984), or to the scene of a crime, Dawson v. State, 710 So.2d 472 (Ala.1997).
“ ‘The problem characteristic in each of these, cases.is the extraneous nature of the fact .introduced to or considered by the jury. The improper matter someone argues the jury considered must have been obtained by the jury or introduced to it by some process outside the scope of the trial. Otherwise, matters that the jurors bring up in their deliberations are simply not improper under Alabama. law, because the law protects debates and discussions of jurors and statements they make while deliberating their decision. CSX Transp. v. Dansby, 659 So.2d 35 (Ala.1995). This Court has also noted that the debates and discussions of the jury, •without regard to their propriety or lack thereof, are not extraneous facts that would provide an exception to the general rule of exclusion of juror affidavits to impeach the verdict. Weekley v. Horn, 263 Ala. 364, 82 So.2d 341 (1955).
“‘Nothing contained in the affidavits indicates the jury considered any extraneous facts. All the statements in the affidavits relate to evidence that was presented at trial or to information that was otherwise brought to the attention of the jury during the trial. The affidavits provide no '^evidence that the- jury- consulted any outside sources of information'regarding the definition of “standard of care,” or regarding any other matter. Nothing in either of the affidavits indicates that’ the jury, or any particular juror, was influenced by any outside source. The trial court did not abuse its discretion in denying the plaintiffs’ post-trial motions seeking discovery regarding the jury’s deliberations. HealthTrust, Inc. v. Cantrell, 689 So.2d 822 (Ala.1997).’
“Sharrief, 798 So.2d at 652-53 (emphasis added).
“In accordance with these decisions, we hold that in order for information to come within the extraneous-information exception to Rule 606(b), the information must come to the jurors from some external authority or through some process outside the scope of the -trial, either *618 (1) during the trial or the jury’s deliberations or (2) before the trial but for the purpose of influencing the particular trial. In this case, we hold that the alleged prejudicial information — personal experiences with the use of Pitocin in induced labor — is not extraneous information under the exception to Rule 606(b). The information did not come to the jury from some external authority or through some process outside the scope of the trial, as defined above; rather, it arose solely from within the ‘debates and discussions’ of the jurors during the process of deliberating. Therefore, the trial court did not err in striking the affidavit and in denying the Betheas’ motion for a new trial.”
833 So.2d at 7-9.
Marshall contends that, during guilt-phase deliberation, juror M.J., in response to a question from another juror, stated that Alicia’s “vaginal tear could not have been caused by female- masturbation” (Marshall’s brief, p. 121), which, he says, is “extraneous information.” Marshall, however, proffered no evidence indicating that juror M.J.’s statement — whether correct or incorrect — was obtained “through some process outside the scope of the trial.” See Springhill, 833 So.2d at 8. Thus, juror M.J.’s statement “arose solely from yrtthin the ‘debates and discussions’ of the jurors during the process of deliberating” and was, therefore, “not extraneous information under.,the exception to Rule 606(b).” Springhill, 833 So.2d at 8-9. Juror M.J.’s statement was a “ ‘matter[ ] that the jurors br[ought] up in their deliberations [and is] simply not improper under Alabama law, because the law protects debates and discussions of jurors and statements they make while deliberating their decision.’” Springhill, 833 So.2d at 8. Accordingly, the circuit court did not err when it excluded juror M.J.’s testimony under Rule 606(b).
III.
Marshall contends that the circuit court erred when it dismissed “several claims asserted in [his] Rule 32 petition.”[14] (Marshall’s brief, p. 124.) Specifically, Marshall alleges that the circuit' court summarily dismissed (1) all but two of his ineffective-assistance-of-trial-counsel claims; (2) his ineffective-assistance-of-appellate-counsel claims; (3) his “claim that the State withheld favorable and material evidence”; (4) his “claim that the trial court admitted inadmissible, prejudicial evidence”; (5) his “claim that [the trial] court erred by not admitting two notes written by [Alicia]”; (6) his “claim that Alabama’s capital sentencing statute violates the sixth amendment of the United States Constitution”; (7) his “claim that the trial court erred by admitting hearsay evidence”; and (8) his “claim that he was convicted on insufficient evidence.”
Initially, we note that, although Marshall listed these eight.claims as being summarily dismissed by the circuit court, Marshall does not specifically argue in his brief on appeal that the circuit court erred in summarily dismissing each of those listed claims. Marshall, instead, makes specific arguments with regard to the circuit court’s summary dismissal of only his ineffective-assistance-of-trial-counsel claims, his ineffective-assistance-of-appellate-counsel claims, his prosecutorial-misconduct claim, his- claim that the trial court erred when it prevented Marshall from presenting two letters written by Alicia, and his claim that Alabama’s “eápital sentencing scheme violates the sixth amendment to the constitution.” We' address only those claims specifically listed and argued in Marshall’s brief on appeal. See Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995) (“We will not review issues not listed and argued in brief.”).
*619 Additionally, we recognize that Marshall contends, in passing, that the circuit court “erred in ... not allowing him to amend his Rule 32 petition as necessary.” (Marshall’s brief, p. 126.) Marshall, however, cites no authority to support this bare allegation. Consequently, to the extent he claims that the circuit court erred when it did not allow him to amend those claims that were summarily dismissed, Marshall failed to satisfy Rule 28(a)(10), Ala. R.App. P., which requires that an argument contain “the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.” It is well settled that “‘“[i]t is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.” ’ ” Ex parte Borden, 60 So.3d 940, 943 (Ala.2007) (quoting Butler v. Town of Argo, 871 So.2d 1, 20 (Ala.2003), quoting in turn, Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994)).
A.
Marshall contends that the circuit court erred when it summarily dismissed several of his ineffective-assistance-of-trial-counsel claims. Marshall, in his brief on appeal, however, fails to identify a specific claim of ineffective assistance of trial counsel the circuit court improperly sümmarily dismissed. Marshall, instead, argues only that his trial counsel failed to conduct a reasonable investigation “to effectively represent Marshall” and attempts to “prove” this allegation by detailing the evidence presented at the evidentiary hearing that he contends supports his allegation. Thus, on appeal, Marshall fails to establish that the circuit court improperly summarily dismissed a sufficiently pleaded claim of ineffective assistance of trial counsel. See Rule 32.3, Ala. R.Crim. P., and Rule 32.6(b), Ala. R.Crim. P. Consequently, Marshall has provided this Court no basis for reversing the circuit court’s decision to summarily dismiss' some of his ineffective-assistanee-of-trial-counsel claims.
B.
Marshall contends' that the circuit court erred when it summarily dismissed his ineffective-assistancé-of-appellate-counsel claims. ‘ Specifically, Marshall contends that the circuit court erred when it summarily dismissed his claims that his appellate counsel was ineffective for failing to raise several claims of ineffective assistance of trial counsel on direct appeal; that his appellate counsel was ineffective for “failing] to investigate whether Marshall was on probation for crimes committed in Florida and Tennessee”; and that his appellate counsel was ineffective for “failing] to investigaté whether a new ‘amended’ lease was executed which would have rendered [Tonya’s] permission for police to enter Marshall’s apartment invalid.”
Initially, as we recognized in Parts I.A.2. and I.B.1. of this opinion, the underlying premises of Marshall’s claims that his appellate counsel was ineffective for failing to investigate the Florida probation .and for failing to investigate the new lease are without merit. It is well settled that counsel cannot be ineffective for failing to raise a claim that has no merit. See Lee v. State, 44 So.3d 1145, 1173 (Ala.Crim.App.2009) (“Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue.”). Thus, the circuit court properly summarily dismissed this claim. See Rule 32.7(d), Ala. R.Crim. P.
Additionally, although- Marshall raised numerous claims of ineffective assistance of appellate counsel based on his belief that his appellate counsel should have *620 raised claims of ineffective assistance of trial counsel on. direct appeal, Marshall was not prejudiced by his appellate counsel’s failure to raise claims of ineffective assistance of trial counsel on direct appeal because Marshall raised those claims of ineffective assistance of trial counsel in his first timely.filed Rule 32 petition. In fact, had,, Marshall’s appellate counsel raised claims of ineffective assistance of trial counsel on direct appeal, Marshall would be precluded from raising those claims in this .Rule 32 petition. See Cogman v. State, 852 So.2d 191, 192 (Ala.Crim.App. 2002) (holding that ineffective-assistance-of-counsel claims are nonjurisdictional and subject to the grounds of preclusion set forth in Rule 32.2, Ala. R.Crim. P.); cf. V.R. v. State, 852 So.2d 194, 202 (Ala.Crim.App.2002) (opinion on application for rehearing) (“Therefore, we hold that a defendant is not precluded by Rule 32.2(a)(3) and (5) from raising an ineffective-assistance-of-trial-counsel .claim for the first time in a Rule 32 petition if the trial transcript was not prepared in time for appellate counsel to have reviewed the transcript to' ascertain whether such ' a claim was viable and to present the claim in a timely filed motion for a new trial.”). Thus, the circuit court did not err when it summarily dismissed Marshall’s claims of ineffective assistance of appellate counsel.
C.
Marshall contends that the circuit court erred when- it summarily dismissed his prosecutorial-misconduct claim. Specifically, Marshall contends that the prosecutor engaged in misconduct
“during both the guilt and penalty phases of Marshall’s trial, as he misconstrued the facts and misstated the law, depriving Marshall of his right to a due process and a fair trial in clear violation of both the United States Constitution and Alabama law.
“Prosecutorial misconduct also occurred during the penalty phase when the prosecutor admitted into evidence and argued that Marshall was still on probation for a conviction of a burglary in 1985 in Florida when, in fact, they were told Marshall’s probation had -already ended. (TR. 757-58). The entirety of the Florida records with regard to Marshall’s sentence was included in the original trial record. Despite those records, which clearly reflect that Marshall’s sentence of probation was terminated and transferred to a sentence of 2 years of community control, the prosecutor told the jury that Marshall was on probation when this alleged crime was committed.”
(Marshall’s brief, pp. 137-38.)
Initially, we question whether Marshall satisfied Rule 28(a)(10), Ala. R.App. P., which requires that an argument contain “the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.”
Although Marshall cites Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), for the general proposition that “,[t]he duty, of a prosecutor is to seek justice, not merely to convict,” and cites Rule 3.8, Ala. R. Prof. Conduct, for the general proposition that “ ‘[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate’ (Marshall’s brief, p. .137), “‘“[i]t is not the function of this Court to do a party’s legal research or to make and address legal arguments for a. party based on undelineated general propositions not supported by sufficient authority or argument.” ’ ” Ex parte Borden, 60 So.3d 940, 943 (Ala.2007) (quoting Butler v. Town of Argo, 871 So.2d 1, 20 (Ala.2003), quoting in *621 turn Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994)).
Regardless, Marshall’s claim is without merit. It is well settled that claims of prosecutorial misconduct are nonjurisdic-tional and subject to the grounds of preclusion set forth in Rule 32.2, Ala. R.Crim. P. See Sunday v. State, 857 So.2d 166, 169 (Ala.Crim.App.2002) (“[Sunday’s prosecutorial-misconduct claim] is precluded because it could have been, but was not, raised at trial or on appeal.”).
Rules 32.2(a)(3) and (5), Ala. R.Crim. P., provide that “[a] petitioner will not be given relief under this rule based upon any ground.... [w]hich could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or_ [w]hich could have been'but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b).”
Because Marshall could have, but did1 not, raise his prosecutorial-misconduct claim either at trial or on appeal, the circuit court did not err when it concluded in its order denying Marshall’s Rule 32 petition that this “claim is procedurally barred because it could have been, but was not, raised at trial or' on direct appeal, in violation of Rules 32.2(a)(3) and 32.2(a)(5), [Ala. R.Crim. P.].” (C. 1036.)
" Moreover, this claim was not, as Marshall contends, summarily dismissed by the circuit court; rather, the circuit court expressly denied the State’s motion to summarily dismiss Marshall’s prosecu-torial-misconduct claim. (C. 20.) Thus, the circuit court allowed Marshall the opportunity to prove his prosecutorial-mis-conduct claim at the evidentiary hearing. Marshall, however, failed to present‘any evidence in support of this claim at the evidentiary hearing. ■ Consequently, the circuit court correctly concluded that, even if this claim were not precluded-under Rules 32.2(a)(3) and (5), Marshall had “abandoned” this claim, finding that “[d]uring this entire postconviction review process this court has heard no evidence in support of a prosecutorial misconduct claim.” (C. 1036.)
- D.
Marshall contends that the circuit court erred when it summarily dismissed his claim that the trial court improperly “sustained the State’s-objection to the admission of two letters written by [Alicia] to her boyfriend,” which, he says, would have “showed that [Alicia] was sexually active and that someone other than Marshall could have caused the. vaginal tear.” (Marshall’s brief, p. 138.) Claims challenging a trial court’s decision to admit evidence, however,..are nonjurisdictional and subject to the pounds of preclusion set forth in Rule 32.2, Ala. R.Crim. P. See Fortner v. State, 825 So.2d 876, 880 (Ala.Crim.App.2001) (holding that claims challenging the admission of evidence are waivable and are, therefore, nonjurisdie-tional).
Rules 32.2(a)(2) and (5), Ala. R.Crim. P., provide -that “[a] petitioner, will not be given relief .under this rule based upon any ground- [w]hich was raised or addressed at trial; or.... [w]hich could have been but was not raised on appeal, unless the ground for relief arises- under Rule 32.1(b).”
Here, before trial, the State filed a motion in limine to prevent Marshall from introducing the complained-of letters. In response, Marshall argued to the trial court that it was necessary to introduce the letters because they could establish that Alicia “could certainly have gotten that small [vaginal] tear in some other situation other than being raped by [Marshall].” .(Record on Direct Appeal, R. 57.) The trial court granted the State’s motion in limine, and Marshall did not raise the issue on direct appeal.
*622 Because Marshall’s claim was raised and addressed at trial and could have been raised, but was not, on direct appeal, the circuit court did not err when it concluded that Marshall’s claim was precluded under Rules 32.2(a)(2) and (5), Ala. R.Crim. P. (C. 990.)
E.
Marshall contends that the circuit court erred when it summarily dismissed his claim that “Alabama’s capital sentencing" scheme'violates the sixth amendment to the constitution.” (Marshall’s brief, p. 140.) Specifically, Marshall argues:
' “Pursuant to Ring v. Arizona, [536 U.S. 584,] 122 S.Ct. 2428 (2002) and Apprendi v. New Jersey, 530 U.S. 466 (2000), established U.S. Suprercie’Court case law now holds that a jury must reliably make any fact findings necessary to support a sentence of death. In Alabama, a sentence of death can be imposed only when two separate fact findings are made: First, that aggravating circumstances are found to exist beyond a reasonable doubt, see Ala.Code § 13A-6-45(f) (1975), and second, that the aggravating circumstances outweigh any mitigating circumstances. See Ala. Code § 13A-5-46(e)(2) (1975) (if aggravating circumstances do not outweigh mitigating circumstances, penalty ‘shall’ be life imprisonment without parole). In Marshall’s case, these two distinct factual findings were not made by the jury, but by the judge. Consequently, Marshall’s death sentence is invalid.”
(Marshall’s brief, pp. 140-41.)
Marshall’s precise claim, however, has been addressed and decided adversely to him by the Alabama Supreme Court, see Ex parte Waldrop, 859 So.2d 1181, 1190 (Ala.2002) (holding that “the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Appren-di do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.”), and is, therefore, on its face,' without merit. Consequently, the circuit court did not err when it summarily dismissed'Marshall’s claim.
Moreover, it is well settled that a claim challenging the constitutionality of a statute is nonjurisdictional and is subject to the grounds of preclusion set forth in Rule 32.2, Ala. R.Crim. P. See Griggs v. State, 980 So.2d 1031 (Ala.Crim.App.2006) (a challenge to the constitutionality of a statute is a nonjurisdictional claim and is subject to the procedural bars of Rule 32.2). Because Marshall could have, but did not, challenge the constitutionality of “Alabama’s capital sentencing scheme” on appeal, the circuit court did not err when it summarily dismissed Marshall’s claim finding that it was precluded under Rule 32.2(a)(5), Ala. R.Crim. P.
IV.
Marshall contends that he asserted numerous claims that “were set out in his Rule 32 petition, which were either dismissed by the [circuit] court or seemingly not addressed by the [circuit] court on which Marshall was entitled to a hearing.” Specifically, Marshall takes umbrage with the circuit court’s treatment of the following claims: that his “defense counsel failed to adequately discuss and advise Marshall with regard to the plea offer from the district attorney’s office”; that his “defense counsel failed to investigate Marshall’s state of mind and competency at the time of his arrest and confinement”; that his “defense counsel failed to object to prejudicial victim impact evidence during the guilty phase”; that his defense counsel failed to object to the continuous admission of hearsay evidence”; that his “defense *623 counsel’s apparent disinterest about the admission of Marshall’s inculpatory statement constituted deficient performance”; that his “defense counsel erred in failing to object to expert testimony by an unqualified witness”;- that his “trial counsel failed to object to incomplete jury instructions”; that his “defense counsel’s closing statements were harmful to. Marshall”; that “the State withheld favorable and material evidence from the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963)”; that the “trial court erred in admitting inadmissible prejudicial evidence”; that “the State failed to meet its burden of proving all elements of the offense”; and that “the circuit court’s essentially verbatim adoption of the proposed order submitted by thé State in the Rule 32 proceeding violated Marshall’s constitutionally protected due process rights.”
Initially, we recognize that Marshall’s claims regarding alleged errors from his trial counsel, his claim that the State withheld favorable evidence, and his claim that the trial court improperly admitted evidence all failed to satisfy the requirements of Rule 28(a)(10), Ala. R.App, P., which, as set out above, requires that an argument contain “the contentions - of the appellant/petitioner with respect to the issues presented, and the reasons therefor, toith citations to the eases, statutes, other authorities, and parts of the record relied on.” (Emphasis added.)
Marshall, in raising ■ these arguments, cites no authority supporting his claims.[15] It is well' settled that “‘“[i]t is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party based on undelineated general propositioiis not supported by sufficient authority or argument.” ’ ” Borden, 60 So.3d at 943 (quoting Butler, 871 So.2d at 20, quoting in turn Dykes, 652 So.2d at 251). Consequently, these’argument's do not satisfy Rule 28(a)(10), Ala. R.App. P., and are deemed abandoned; We now turn to Marshall’s remaining claims.
A.
Marshall contends that the “State failed to prove that there was a burglary, failed to prove that the crime- was committed while Marshall was undér sentence of imprisonment, and failed to prove that á rape or sexual contact had been committed.” (Marshall’s brief, p; 155.)
We question whether Marshall’s half-page, two-paragraph argument, which cites both In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), without any explanation as to how those cases apply to his argument; satisfies Rule 28(a)(10), Ala. R.App. P. Moreover, the circuit court properly dismissed this claim.
*624 It is well settled that posteonviction claims challenging the sufficiency of the State’s evidence are nonjurisdictional and subject to the grounds of preclusion set forth in Rule 32.2, Ala. R.Crim. P. See Ex parte Batey, 958 So.2d 339, 343 (Ala.2006) (“Alabama , courts have repeatedly, held that an argument about the adequacy of the State’s evidence is not jurisdictional and is therefore barred by Rule 32.2.”).
Rule 32.2(a)(4), Ala. R.Crim. P., provides, in part, that “[a] petitioner will not be given relief under this rule based upon any ground — [w]hich was raised or addressed on appeal.”
Marshall, on direct appeal, challenged the sufficiency of the State’s evidence to support his convictions for capital murder, which this Court affirmed. See Marshall v. State, 992 So.2d at 770-74. . Although Marshall contends.that he is.entitled to a hearing on this claim, the claim is precluded under Rule 32.2(a)(4), Ala. R.Crini. P. Accordingly, the circuit court did not err when it summarily dismissed this claim. (C. 21.)
B.
.Marshall contends that .¡the “circuit- court’s essentially verbatim adoption of the proposed order submitted by the State in the Rule 32 proceeding violated Marshall’s constitutionally protected due process rights,” (Marshall’s brief, p. 156.) Marshall’s claim is without merit.
“1 “While the practice of adopting the state’s proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Hubbard v. State, 584 So.2d 895 (Ala.Cr.App.1991); Weeks v. State, 568 So.2d 864 (Ala.Cr.App.1989), cert. denied, 498 U.S. 882, 111 act 230, 112 L.Ed.2d 184 (1990); Morrison v. State, 551 So.2d 435 (Ala.Cr.App.), cert. denied, 495 U.S. 911, 110 act 1938, 109 L.Ed.2d 301 (1990).”
“ ‘Bell v. State, 593 So.2d 123, 126 (Ala.Crim.App.1991). See also Dobyne v. State, 805 So.2d 733, 741 (Ala.Crim.App.2000); Jones v. State, 753 So.2d 1174, 1180 (Ala.Crim.App.1999).
“‘More recently in Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006), we stated:
“.‘“[T]his Court has repeatedly upheld the practice of adopting, the State’s proposed order when denying a Rule 32 petition for postcon-viction relief. See, e.g., Coral v. State, 900 So.2d 1274, 1288 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005), and the cases cited therein. ‘Alabama courts have consistently held that even when a trial court adopts verbatim a party’s proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous.’ McGahee v. State, 885 So.2d 191, 229-30 (Ala.Crim.App.2003).”-
“ ‘950 So.2d at 371.
“‘However, the Alabama Supreme Court has admonished that “appellate courts must be careful to evaluate a claim that a prepared order drafted by the prevailing party and adopted by the trial court verbatim does not reflect the independent and impartial findings and conclusions of the trial court.” Ex parte Ingram, 51 So.3d 1119, 1124 (Ala.2010).
*625 “‘In Ingram, the Supreme Court held that the circuit court’s adoption of the State’s proposed order denying postconviction relief was erroneous because, it said, the order stated that it was based in part on the personal knowledge and observations of thé trial judge when the judge who actually signed the order denying the postcon-viction petition was not the- same judge who had presided over Ingram’s capital-murder trial. “[T]he patently erroneous nature of the statements regarding the trial judge’s ‘personal knowledge’ and observations of Ingram’s capital-murder trial undermines any confidence that the. trial judge’s .findings of fact and conclusions of law are the product of the trial judge’s independent judg-ment_” Ingram, 51 So.3d at 1125.

Hi f

“Ray, 80 So.3d [965] at [971-72 (Ala.Crim.App.2011) ].”
Miller v. State, 99 So.3d 349, 355-57 (Ala.Crim.App.2011).
Although Marshall contends that the circuit court “essentially ‘rubber stamped’ the State’s Proposed Order .as its own” and makes a bare allegation that the circuit court did not “conduct its own independent legal analysis” (Marshall’s brief, p. 156), Marshall fails to provide this Court with any reference to the circuit court’s order that is “patently erroneous” or which demonstrates that the circuit court did not exercise its own judgment. In fact, even a cursory comparison of the State’s proposed order and the circuit court’s'order denying Marshall’s Rule 32 petition demonstrates that the circuit court did, in fact, exercise its own independent judgment. For example, in the State’s proposed order the-State included language finding that both Marr shall’s guilt-phase and penalty-phase ineffective-assistance-of-counsel- claims were insufficiently pleaded (C. 856-62); the circuit' court’s order included no such language.[16]
Accordingly, Marshall has not demonstrated that the circuit court did not exercise independent judgment when it denied his Rule 32 petition.

Conclusion

Based on the foregoing reasons, we affirm the circuit court’s summary dismissal, in part, and denial, in part, of Marshall’s Rule 32, Ala. R.Crim. P., petition for post-conviction relief.
AFFIRMED.
WINDOM, P.J., and WELCH and BÜRKE, JJ., concur,
KELLUM, J., concurs in the result.

.' Marshall was also indicted for first-degree rape, see § 13A-6-61, Ala.Code 1975, but was acquitted of that offense.

. The record on appeal includes transcripts of three separate hearings, which are individually numbered: the hearing that occurred on . September 8, 2009, the first portion .of the *580 evidentiary hearing that occurred on February 16, 2010, and the second portion of the evidentiary hearing that occurred on April 1, 2010. Citations to these transcripts will be ■referenced as "(R.1__),” "(R2_),’’ and "(R3. __)," respectively.

. Marshall raises these arguments in “Issue I” and "Issue II” in his brief on appeal.

. Although Marshall, in his brief on appeal, argues in passing that the circuit court's exclusion of Dr. Nichols’s testimony was "prejudicial,” Marshall cites no authority to support his claim.

. Although Marshall alleged in his second amended Rule 32 petition that his trial counsel were ineffective for failing to hire a foren- ■ sic pathologist to challenge Dr. Shores’s testimony, Marshall neither alleged whom Mathis should have hired nor demonstrated what that forensic pathologist’s testimony would have been. This Court has consistently held that these deficiencies in pleading do not satisfy the full-fact pleading requirements of Rule 32.6(b), Ala. R.Crim. P. See Boyd v. State, 913 So.2d 1113, 1133 (Ala.Crim.App.2003) (holding that a petition that "does not disclose what type of expert counsel' should have been obtained, or the manner in which any such expert would have countered the State’s expert testimony,” is insufficiently pleaded) (citing Williams v. State, 783 So.2d 108, 129-30 (Ala.Crim.App.2000)). Because the circuit court, however, did not find that this claim was insufficiently pleaded and allowed Marshall to present evidence to support this claim, this Court cannot "look back” and conclude that Marshall’s claim was insufficiently pleaded. See Ex parte McCall, 30 So.3d 400, 403-04 (Ala.2008) ("The trial court held an evidentiary hearing on the petition. By holding that hearing, the trial court implicitly found that the issues presented were ‘material issue[s] of law or fact ... which would entitle '[McCall] to relief,’ Rule 32.7(d), and, under Rule 32.9(d), the trial court therefore had a responsibility to make findings of fact as to each of those issues. Instead.of issuing any such findings, however, the trial court dismissed McCall’s petition on the ground that his ‘bare allegations’ of prejudice were not sufficient 'to' state a claim of ineffective assistance of- counsel. Althoúgh this conclusion may,have been,an appropriate basis for a summary dismissal of, the petition before a hearing was held, once a hearing has been held Rule 32.9(d) requires findings of fact in support of the judgment. Under our decision in Ex parte Grau, [791 So.2d 345 (Ala.2000),] the trial court’s failure to issue such findings is grounds for reversal.”).

. The circuit court also concluded that Marshall’s trial counsel were not deficient for failing to obtain the Florida order. Because Marshall did not suffer any prejudice from his trial counsel’s alleged deficiencies, it is unnecessary for us to address the circuit court’s conclusion that Marshall’s trial counsel were not deficient. See Boyd v. State, 746 So.2d 364, 375-76 (Ala.Crim.App.1999) (" ’ “In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs. Id. [466 U.S.] at 697, [104 S.Ct. 2052], In fact, the Court explained that ‘if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.’ Id.” ’ ”) (quoting Davis v. State, 720 So.2d 1006, 1013-14 (Ala.Crim.App.1998), quoting in turn Thomas v. State, 511 So.2d 248, 255 (Ala.Crim.App.1987)).

. Marshall raises these claims in sections I.A.2.-6 in his brief on appeal. Because these claims are grounded in Marshall's allegation that his trial counsel failed to adequately investigate and present available mitigation evidence, we address them in this section of our opinion.

. The circuit court did not allow Vogelsang to testify at the Rule 32 evidentiary hearing; instead, Marshall submitted her testimony by way of affidavit as a proffer of Vogelsang’s testimony. (R2. 4Q1.) . Marshall does not contend on appeal, however, that the circuit court improperly excluded Vogelsang’s testimony; rather, Marshall argues only that his trial counsel should have retained a mitigation expert.

. Our conclusion would be the same even if we reweighed the aggravating and mitigating circumstances by assuming that Marshall was not on probation in Florida at the time he murdered Alicia and balancing the two remaining. aggravating circumstances against the allegedly omitted mitigating factors.

. Marshall raises this argument in "Issue III” in his brief on appeal. .

. Marshall did not allege which jurors failed to truthfully answer voir-dire questions in his original Rule 32 petition; the circuit court, however, allowed Marshall to amend his juror-misconduct claims to comply with the pleading and specificity requirements set forth in Riile 32.3, Ala. R.Crim. P., and Rule 32.6(b), Ala. R.Crim. P. (C. 20.) Marshall eventually identified the complained-of jurors in his second amended Rule 32 petition. (C. 579-84.) ,

. Although Marshall contends that juror M.J. failed to respond to several questions, Marshall’s questions during the evidentiary hearing centered around juror M.J.’s response to the question regarding being the victim of a crime.

. Marshall, in his reply brief, contends that he did, in fact, argue in his initial brief on appeal that the circuit court erred in excludIng juror M.J.’s testimony. (Marshall’s reply brief, p. 27.) •

. Marshall ■ raises this argument in "Issue IV” in his brief on appeal.

. We recognize that Marshall, in his claim regarding his trial counsel’s failure to object to incomplete jury instructions, cited this Court’s opinion in Marshall’s direct appeal. Marshall did so, however, only to show that this Court recognized that Marshall’s counsel did not object to the trial court's instruction regarding aggravating and mitigating circumstances.
We also recognize that Marshall, in his claim regarding the State’s failure to provide favorable and material evidence to,the defense, cited Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Marshall’s citation to Brady, however, appears only in the heading to this section of Marshall’s brief on appeal. Marshall, in his argument, cites no authority to support his claim. Moreover, although Marshall contends that the State withheld “the results of DNA testing” and a set of "handcuffs lined with fur,” he does not explain’how those items were both exculpatory and material.

. Marshall concedes in his reply brief that the circuit court did not adopt the State’s proposed order verbatim; Marshall, instead, argues only that the circuit court’s- "order is against the great weight of evidence presented at the Rule 32 hearing.” (Marshall’s reply brief, p. 40.)